Lueleni **MAKA, dba Maka's Akamai Service, and Maka's Akamai Service Inc., Petitioner,**

v.

**U.S. IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

No. 89–70030.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 12, 1990.

Decided June 4, 1990.

George Noguchi, Honolulu, Hawaii, for petitioner.

Karen Fletcher, Office of Immigration Litigation, U.S. Dept. of Justice, Washington, D.C., for respondent.

Before FARRIS, PREGERSON and RYMER, Circuit Judges.

RYMER, Circuit Judge:

Maka's Akamai Service petitions this court to review an order of the Chief Administrative Hearing Officer finding Maka in violation of the Immigration Reform and Control Act of 1986 (IRCA), Pub.L. No. 99–603, 100 Stat. 3359 (1986) (codified in scattered sections of 8 U.S.C.). The order found that Maka had violated § 274A(a)(1)(A) of the Act, 8 U.S.C. § 1324a(a)(1)(A), for unlawfully employing, after November 6, 1986, an alien not authorized for employment in the United States. The order also found Maka in violation of § 274A(a)(1)(B) of the Act, 8 U.S.C. § 1324a(a)(1)(B), for failing to comply with the Act's formal verification requirements. We affirm.

I

Maka is an immigrant alien from Tonga who operates both a tree trimming and ground maintenance business and a farm. On August 27, 1987 an agent for the Immigration and Naturalization Service (INS) made an educational visit to Maka's residence and furnished a Handbook for Employers.[1] During this visit the agent noted that he "saw about 10 people there. One claimed to be a new hire."

On August 28, 1987, the INS issued a Notice of Inspection to Maka's Akamai Service, that was served at Maka's residence on Maka's mother on August 31, 1987. The Notice of Inspection stated in part:

Section 274A of the Immigration and Nationality Act, as amended by the Immigration Reform and Control Act of 1986, requires employers to hire only American citizens and aliens who are authorized to work in the United States. Employers must verify employment eligibility of persons hired after November 6, 1986, using the Employment Eligibility Verification Form (I–9).

You have been selected for a compliance review and audit by the Immigration and Naturalization Service (INS) on Thursday September 3, 1987. . . .

During this review, Special Agent Robert Lasack will discuss the requirements of the law with you and inspect your I–9 Forms. The purpose of this review is to assess your compliance with the provisions of the law.

On September 1, 1987, Maka's attorney, responding to the Notice, informed the INS that "Maka's Akamai Service has hired no one after November 6, 1986 and therefore has nothing available for review on any employment eligibility verification form (I–9)." INS agents arrived at Maka's residence on September 3, 1987, for the scheduled audit, but were unable to conduct the inspection because neither Maka nor a representative of his company was present.

On September 18, 1987, the INS issued a second Notice of Inspection, informing Maka that an inspection was scheduled for September 23, 1987. This Notice was served on Maka's wife. On September 23, the INS agents arrived at Maka's residence to conduct their inspection, but again Maka was not present and the agents were unable to proceed.

On October 20, 1987, a Citation, pursuant to 8 U.S.C. § 1324a(i)(2), was served on Maka's Akamai Service for failure to present Forms (I–9) at the scheduled inspections. This citation was Maka's first violation of IRCA during the 12–month first citation period for "statutory immunization" purposes.

On October 26, 1987, the INS issued a third Notice of Inspection, informing Maka that a compliance audit would take place on

---

**1.** To further IRCA the INS initiated a program to educate employers regarding the provisions of the statute. INS agents would contact employers and educate them regarding their obligations and responsibilities under IRCA and provide them with the Handbook for Employers.

October 30, 1987. This Notice was personally served on Maka's attorney. The INS also requested that Maka provide employee and payroll records. On October 30, the parties met for the scheduled inspection. Maka's attorney presented the INS agents with a letter stating that Maka's Akamai Service had not hired anyone after November 6, 1986, and therefore no I–9 Forms were on file. Attached to the letter was a hand-written list of all employees who had worked for Maka's Akamai Service since November 6, 1986. This list did not include the name of Feaomoeata Kapetaua.

Also on October 30, the INS conducted a raid on Maka's workers at the Marine Corps Air Station in Kaneohe. Maka's employee Kapetaua was interviewed at the scene. He stated that he was hired "last week Monday" (October 19, 1987). Kapetaua could not provide any documentation that he was lawfully in the United States or working with authorization from the government.

The INS served a subpoena on Maka through his attorney on November 5, 1987. The subpoena ordered Maka to produce, on November 10, 1987, personnel and payroll records for all of Maka's employees as of November 6, 1986, as well as personnel and payroll records for all employees hired after November 6, 1986. The subpoena also requested Maka to present I–9 employment eligibility forms for Kapetaua and three other individuals. Maka's attorney responded to the subpoena, in a letter dated November 9, as follows:

> In response to your question ... my client alleges that no employee records exist for any and all employees as of November 6, 1987. As stated to your agent ... my client is trying to reconstruct all his cash payments and other remuneration paid to his employees since 1982 in order to file his taxes and to account to various Federal and State agencies for his failure to file and pay certain employee assessments. In good faith, we provided ... a list of substantially all employees who were on the payroll in November 1987.... [A]ll of them were working prior to November 6, 1986 and as such need not fill out the I–9 form.

> ....

> As to your request for I–9 forms for the individuals listed therein, we answer as follows:

> 1. Feaomoeta Kapetaua—No I–9 form is required because this individual has worked for my client prior to Nov. 6, 1986. Since Nov. 6, 1986 he has worked only two to five days per month.... His name was inadvertently omitted from the list given to agent Kirk due to his infrequent employment.

Maka was served with a Notice of Intent to Fine on January 4, 1988, pursuant to 8 C.F.R. § 274a.9(c). Maka answered the Notice on February 3, 1988, and requested a hearing before an Administrative Law Judge (ALJ). The United States filed a complaint against Maka on February 23, 1988, and amended the complaint on July 11, 1988. In the amended complaint Maka was charged with two counts involving Kapetaua:

> First, Maka was charged with violating 8 U.S.C. § 1324a(a)(1)(A) which makes it unlawful, after November 6, 1986, for a person or other entity to hire, for employment in the United States, an alien knowing the alien is unauthorized for employment in the United States.

> Second, Maka was charged with violating 8 U.S.C. § 1324a(a)(1)(B) which makes it unlawful, after November 6, 1986, for a person or other entity to hire, for employment in the United States, an individual without complying with the requirements of section 274A(b) of the Act, 8 U.S.C. § 1324a(b), and 8 C.F.R. §§ 274a.2(b)(1)(i) and (ii).[2]

After a hearing, the ALJ filed his Findings of Fact and Conclusions of Law. The ALJ found that Maka "was not in violation of the Immigration Reform and Control

---

**2.** Section 274A(b) of the Act makes it unlawful, after November 6, 1986, for a person or other entity to hire or recruit or refer for employment an individual, alien or U.S. citizen, without first examining certain documents establishing the individual's identity and authorization to work.

Act of 1986, specifically sections 274A(a)(1)(A) and 274A(a)(1)(B) of the Immigration and Nationality Act." The ALJ found that the evidence established that Maka had continuously employed Kapetaua "from prior to November 6, 1986 until approximately March 1988 as either a tree trimmer, grounds maintenance man, or agricultural worker." Therefore, Maka did not violate the IRCA because Kapetaua was a grandfathered employee, and thus §§ 1324a(a)(1)(A) and (a)(1)(B) did not apply to Kapetaua's employment.

On November 18, 1988, the INS filed a request with the Chief Administrative Hearing Officer (CAHO) for an administrative review of the ALJ's decision pursuant to 8 U.S.C. § 1324a(e)(7). The CAHO vacated the ALJ's decision. The CAHO held that

> [t]he evidence in this proceeding clearly establishes that Kapetaua 'quit' working for Maka's sometime in December 1986, and thereby terminated his employment relationship with [Maka]. Thus, Kapetaua forfeited his 'grandfathered employee status' under Section 274A(a)(3). 8 U.S.C. 1324a(a)(3). Accordingly, [Maka] violated Sections 274A(a)(1)(A) and (a)(1)(B) of the INA when he rehired Kapetaua in the Summer of 1987 knowing that he was an alien unauthorized for employment in the United States.

The CAHO levied fines totalling $3,000 against Maka, the same amount the INS assessed in the Notice of Intent to Fine. Maka appeals.

## II

■ The standard of review for agency decisions under IRCA is the same standard of review applied under the Administrative Procedure Act (APA). *Mester Mfg. Co. v. INS*, 879 F.2d 561, 565 (9th Cir.1989). We must affirm the agency's findings of fact that are supported by substantial evidence. *Id.* Substantial evidence is "more than a mere scintilla. It means such relevant evidence, as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971)

(citation omitted). "In assessing whether a finding is supported by substantial evidence, we must consider the record as a whole." *Howard v. Heckler*, 782 F.2d 1484, 1487 (9th Cir.1986).

■ Under the substantial evidence standard, the task of this court is to review the CAHO's decision, not the decision of the ALJ. *Id.* The substantial evidence standard "is not modified in any way" merely because the CAHO and the ALJ disagree. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 496, 71 S.Ct. 456, 468, 95 L.Ed. 456 (1951); *Howard v. Heckler*, 782 F.2d at 1487. However, "evidence supporting [the CAHO's] conclusion may be less substantial when an impartial, experienced examiner [like the ALJ] has observed the witnesses and lived with the case has drawn [different] conclusions...." *Universal Camera*, 340 U.S. at 496, 71 S.Ct. at 468. The CAHO may disagree with the credibility findings of the ALJ

> but only if there is substantial evidence undercutting the reliability of the testimony, evidence which "a reasonable mind might accept as adequate to support a conclusion" that the administrative law judge was wrong about the credibility of the witness, in spite of the advantage of having heard the testimony and lived with the case.

*Beavers v. Secretary of H.E.W.*, 577 F.2d 383, 388 (6th Cir.1978) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)). When the CAHO rejects the credibility findings of the ALJ, "it must state its reasons for doing so, and the reasons must be based upon substantial evidence in the record." *Howard v. Heckler*, 782 F.2d at 1487.

■ We review de novo an agency's conclusions of law. *Mester Mfg. Co.*, 879 F.2d at 565. "Within the de novo framework we give a certain amount of deference to an agency's reasonable construction of a statute it is charged with administering.... If an agency's construction is reasonable and consistent with congressional intent, we will accept it." *Id.*

## III

■ The IRCA grants the Attorney General authority to modify or vacate the initial decision of the ALJ. 8 U.S.C. § 1324a(e)(7) (West Supp.1990).[3] The Attorney General explicitly delegated part of this review power to CAHO.

Maka first argues that 28 C.F.R. § 68.52, the regulation implementing the CAHO's authority to review the initial ALJ decision, is void for vagueness.[4] Maka argues that this regulation is unconstitutionally vague because it allows the CAHO "standardless discretion" in reversing factual findings of the trial judge. Maka's argument fails because the CAHO's review pursuant to § 68.52 is subject to the provisions of the APA.[5] The APA provides that, on review of an ALJ decision, the agency shall have "all the powers which it would have in making the initial decision...."[6] 5 U.S.C.

§ 557(b) (1982). The statute authorizes the agency to decide all issues de novo. *Containerfreight Transp. Co. v. I.C.C.*, 651 F.2d 668, 670 (9th Cir.1981).[7]

Additionally, § 556 of the APA provides that "[a] sanction may not be imposed or rule or order issued except on consideration of the whole record or those parts thereof cited by a party and supported by and in accordance with the reliable, probative, and substantive evidence." 5 U.S.C. § 556(d).[8] Therefore, the APA mandates that in making its decision, the CAHO consider the whole record and base its decision on "reliable, probative, and substantial evidence." *See id.* The CAHO did not have standardless discretion to reverse the findings of the ALJ.

■ Maka next argues that § 68.52's provision that a party may file with the CAHO within five days of the decision a

**3.** Section 1324a(e)(7) provides:
*Administrative Appellate Review.*
The decision and order of an administrative law judge shall become the final agency decision and order of the Attorney General unless, within 30 days, the Attorney General modifies or vacates the decision and order, in which case the decision and order of the Attorney General shall become a final order under this subsection. The Attorney General may not delegate the Attorney General's authority under this paragraph to any entity which has review authority over immigration-related matters.

**4.** Section 68.52 states, in part:
Upon issuance of a final order by an Administrative Law Judge in an unlawful employment ... case under 8 U.S.C. 1324a, a copy of the decision together with the record of proceeding will be forwarded to the Chief Administrative Hearing Officer, an official having no review authority over other immigration-related matters, who may conduct such review he or she deems appropriate. Any party may file with the Chief Administrative Hearing Officer within five (5) days of the date of the decision a written request for review of any issue of law together with supporting arguments. Within thirty (30) days from date of decision, the Chief Administrative Hearing Officer may issue an order which adopts, affirms, modifies or vacates the Administrative Law Judge's order.

**5.** Under the IRCA, hearings before an ALJ are conducted in accordance with the requirements of § 554 of the APA. 8 U.S.C. § 1324a(e)(3)(B). This requirement implicates other sections of the APA. First, § 556 of the APA prescribes

procedures for all § 554 hearings. 5 U.S.C. § 556 (1982). Second, APA § 557 applies in all cases where a hearing must be conducted pursuant to § 556. 5 U.S.C. § 557(a).

**6.** Maka argues that the broad scope of review contained in § 557 does not apply to this case because the CAHO is not an officer of the INS. This argument has no merit. Agency for purposes of the Act is defined as "each authority of the United States," other than certain exclusions. 5 U.S.C. § 551(1) (1982). The Attorney General granted the CAHO authority to review the decisions of the ALJ and none of the specified statutory exclusions embraces the CAHO. Therefore, the CAHO is subject to the provisions of the APA.

**7.** "The Administrative Procedure Act 'does not relegate the Commission to the role of reviewing court' but rather 'confers on [it] the right to make its own conclusions from the evidence.'" *Containerfreight*, 651 F.2d at 670 (quoting *Union Mechling Corp. v. United States*, 390 F.Supp. 411, 419 (W.D.Pa.1974)).

**8.** The administrative record does not support Maka's argument that the CAHO did not conduct its review based upon the whole record. The CAHO's Findings and Conclusions states:
The Chief Administrative hearing officer has conducted a review of the Administrative Law Judge's decision. The documents identified in the record as exhibits, the testimony elicited during the hearing, and arguments presented by counsel, as contained in the record, have been carefully considered....
Maka's argument to the contrary fails.

written request for review of any issue of law with supporting arguments provides an inadequate opportunity for the prevailing party to file an argument opposing reversal of the ALJ's decision. The five day statutory time limit did not violate Maka's right to due process. "The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.' " *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S.Ct. 893, 902, 47 L.Ed.2d 18 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552, 85 S.Ct. 1187, 1191, 14 L.Ed.2d 62 (1965)). Due process requires some form of hearing "before an individual is finally deprived of a property interest." *Id.* Maka was given a full evidentiary hearing before the ALJ. The review at the CAHO stage did not nullify this hearing. The CAHO does not receive evidence, but reviews on the administrative record.[9] In this case the administrative record included Maka's arguments, both oral and written, made before the ALJ. Therefore, the challenged procedure did not deprive Maka of due process.

■ Maka next argues that the service of the Notices of Inspection and the Notice of Intent to Fine was defective and therefore violated Maka's right to due process. The INS served three Notices of Inspection: the first, on August 27, 1987, was served on Maka's mother; the second, on September 8, 1987, was served on Maka's wife; and the third, on October 26, 1987, was served on Maka's attorney. Maka argues that service of the three Notices of Inspection violates due process because the Notices were not served on the proper party. Maka's argument fails.

The INS's method of serving Maka with the Notices of Inspection does not implicate the due process clause because the Notices did not lead to the final deprivation of property from Maka. *See Mester Mfg. Co. v. INS*, 879 F.2d 561, 569 (9th Cir.1989). The Notice of Intent to Fine, not the Notice of Inspection, initiates the adjudicatory proceedings. *Id.* Therefore, the due process clause is not implicated when a Notice of Inspection is issued.[10]

Once the Notice of Intent to Fine is issued, and proceedings are initiated, 8 C.F.R. § 103.5a sets out the prescribed methods of service.[11] This regulation provides that delivery of the notice to the attorney effectuates service. 8 C.F.R. § 103.5a(a)(2)(iii). The Notice of Intent to Fine was served upon Maka's attorney. Additionally, the Notice of Intent to Fine was incorporated in the complaint filed against Maka on February 23, 1988. The CAHO found, and Maka makes no argument to the contrary, that the complaint was properly served on Maka on March 4, 1988. Consequently, service of the Notice of Intent to Fine was proper under both the due process clause and the regulations.

Next Maka challenges the CAHO's imposition of a $3,000 civil penalty. IRCA specifically provides that in "determining the amount of the penalty, due consideration shall be given to the size of the business of the employer being charged, the good faith of the employer, the seriousness of the violation, whether or not the individual was an unauthorized alien, and the history of previous violations." 8 U.S.C. § 1324a(e)(5). "[I]mposition of a penalty without consideration of all relevant

---

9. The Examiner's decision is part of the record, and the record must be considered as a whole in order to see whether the result is supported by substantial evidence. The agency's departures from the Examiner's findings are vulnerable if they fail to reflect attentive consideration to the Examiner's decision. Yet in the last analysis it is the agency's function, not the Examiner's, to make the findings of fact and select the ultimate decision, and where there is substantial evidence supporting each result it is the agency's choice that governs.
*Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 853 (D.C.Cir.1970) (footnotes omitted), *cert.*

denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).

10. Similarly, the regulations to the IRCA require personal service only when the Service initiates a proceeding. 8 C.F.R. § 103.5a(c)(1). Consequently, the issuance of a Notice of Inspection does not trigger the personal service requirements of the statute.

11. With regard to the Notice or Intent to Fine, 8 C.F.R. § 274a.9(c) requires that service of the Notice of Intent to Fine "shall be accomplished pursuant to Part 103 of this chapter."

factors is improper." *Holiday Food Serv. v. Dept. of Agriculture,* 820 F.2d 1103, 1105 (9th Cir.1987). "Consideration of these factors is possible only if there is evidence bearing on them in the record." *Id.* at 1106. In this case, the record contains adequate evidence bearing on each of the factors noted above to support the penalty.

Maka next argues that the Notice of Intent to Fine was invalid, prematurely issued and contrary to the intent of Congress.

The enactment of IRCA radically changed immigration law. Congress, therefore, provided for its gradual implementation. The IRCA was implemented in three phases. First, "the six-month period following enactment in November 1986 was a public information period; the appropriate agencies were to disseminate forms and information to employers during this period, and no enforcement action was to take place." *Mester Mfg. Co.,* 879 F.2d at 563. *See* 8 U.S.C. § 1324a(i)(1). Second, the subsequent twelve-month period, June 1, 1987 to May 31, 1988, was a partial enforcement period. For first violations of the statute during this period, only a warning citation would issue. The INS would "not conduct any proceeding, nor issue any order, under [the statute] on the basis of such alleged violation or violations." 8 U.S.C. § 1324a(i)(2). A second violation during this period, however, subsequent to the issuance of a warning citation, could trigger an enforcement proceeding. *See* 8 C.F.R. § 274a.9(c). Finally, after June 1, 1988, the full enforcement period began. At this time, warning citations no longer were required as a prerequisite to the institution of enforcement proceedings.

This case arose during the partial enforcement period.[12] During this period, the issuance of a valid warning citation was necessary before a valid Notice of Intent to Fine could issue. Thus, Maka had one free

shot at violating the IRCA before the INS could issue a Notice of Intent to Fine initiating adjudicatory proceedings. Maka argues that because there was no basis for the issuance of the warning citation, he was denied his one free shot at an IRCA violation, and, therefore, the Notice of Intent to Fine was prematurely issued.

The citation issued against Maka on October 20, 1987 was based upon Maka's failure to "furnish I-9 forms at the time of the audit." The INS concluded from this failure that Maka was in violation of 8 U.S.C. § 1324a(a)(1)(B) (failure to comply with the IRCA's paperwork requirements). Maka first argues that there was no basis to issue a warning citation because Maka's attorney, responding to the first Notice of Inspection, stated that no new hires had taken place after November 6, 1986, therefore, no I-9 forms had to be kept as part of Maka's business records. Maka's theory is that if an attorney presents a letter to the INS stating that the company has no I-9 forms, the INS has no basis to conduct any further action against the company. This argument has no merit.

■ The function of the Notice of Inspection is to allow the INS an opportunity to review a company's records and I-9 forms for the purpose of assessing a company's compliance with the IRCA.[13] Maka's unwillingness to allow the INS to conduct a compliance review and audit prevented the INS from making a compliance determination, thereby effectively precluding enforcement of the IRCA with regards to Maka. Preventing the INS from performing a compliance audit gave the INS reason to issue a warning citation.[14]

Maka next argues that the violations alleged in the Notice of Intent to Fine with respect to Kapetaua were the same violations alleged in the citation. Since the law provides that no action or proceeding can arise out of the first violation, the same

---

**12.** The INS issued the citation on October 20, 1987.

**13.** Maka does not raise any fourth amendment claim on appeal.

**14.** The letter from Maka's attorney did not discharge Maka's duty to be present and allow the compliance audit because unsworn statements of attorneys provide no evidence of compliance with the statute.

violation cannot be the basis for the warning citation and the enforcement proceeding. The same violation, however, was not the basis for the warning citation and the enforcement proceeding. The warning citation was rooted in Maka's failure to allow the INS to perform a compliance audit. The enforcement proceeding concerned Maka's employment of Kapetaua. Therefore, Maka's argument fails.

The CAHO found that Maka violated 8 U.S.C. § 1324a(a)(1)(A) which makes it unlawful, after November 6, 1986, to hire for employment in the United States an alien, *knowing* the alien is unauthorized for employment in the United States.[15] Maka argues that there is insufficient evidence in the record to satisfy the knowledge element of the statute.

The record supports the conclusion that Kapetaua was an unauthorized alien, within the meaning of 8 U.S.C. § 1324a(a)(1)(A).[16] Further, although Maka knew that Kapetaua had entered the United States without work authorization on a nonimmigrant visitor visa, Maka hired Kapetaua as an employee. Therefore, Maka hired for employment an alien knowing that the alien was unauthorized for employment.

■ The issue, however, is whether Maka knowingly hired Kapetaua for employment after November 6, 1986. This turns on whether Maka had notice that Kapetaua had quit working for Maka's Akamai Service. The CAHO found that Maka had constructive notice, if not actual notice. First, Kapetaua told Maka's crew of his intention to quit. Second, as the CAHO

stated, "Maka knew that Kapetaua had 'quit' in December 1986, because when the Aliamanu job came in the Summer of 1987, Maka only had one coconut tree 'climber' and was forced to go personally to Kapetaua's house and ask him to come back to work for Maka's." Substantial evidence supports the CAHO's conclusion that Maka had notice that Kapetaua had quit. Therefore, it did not err in finding that Maka knowingly hired Kapetaua after November 6, 1986, in violation of 8 U.S.C. § 1324a(a)(1)(A).

The CAHO also found that Maka violated 8 U.S.C. § 1324a(a)(1)(B) which makes it unlawful, after November 6, 1986, to hire for employment in the United States an individual, without complying with the requirements of the employer verification system. *See* 8 U.S.C. § 1324a(b). Pursuant to § 1324a(a)(1)(B), the employer has the responsibility to prepare, retain and present for inspection an I–9 Form for each employee hired after November 6, 1986. Maka did not complete an I–9 form for Kapetaua. Therefore, Maka violated § 1324a(a)(1)(B).

■ The IRCA provides for a "good faith" defense to the charge that an employer knowingly hired an unauthorized alien. The statute provides that

[a] person *or* entity that establishes that it has complied in good faith with the requirements of [the employer verification requirements of 8 U.S.C. § 1324a(b) ] with respect to the hiring ... of an alien in the United States has established an affirmative defense that

15. Section 1324a(a)(1)(A) provides: "it is unlawful for a person or other entity to hire ... (A) an alien knowing the alien is an unauthorized alien ... with respect to such employment." An "unauthorized" alien "means with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this chapter or by the Attorney General." 8 U.S.C. § 1324a(h)(3).

16. Maka argues that Kapetaua was not an unauthorized alien because he intended to apply for legalization under the seasonal agricultural workers (SAW) program. IRCA contains a

"[s]pecial rule for legalization." 8 C.F.R. § 274a.11. This special rule authorized "an individual who claims to be eligible, and who *intends to apply* or has applied" for the SAW program "to work without presenting an employer ... with documentary evidence of work authorization." *Id.* (emphasis added). Maka argues that since Kapetaua was in the process of filing a SAW application, Kapetaua was authorized to work under the special rule for legalization. The record contains no evidence that Kapetaua intended to apply for the SAW program. In fact, Maka's testimony supports the opposite conclusion, that Kapetaua had no intention of applying for SAW benefits.

the person or entity has not violated paragraph (1)(A) with respect to such hiring....

8 U.S.C. § 1324a(a)(3). Since Maka did not complete the I–9 verification form for Kapetaua, the good faith defense is not available to him. Maka argues that in good faith he believed that no I–9 Forms had to be completed for his employees, because all of his employees were hired prior to November 6, 1986. This argument has no merit because, as the record shows, Maka knowingly hired Kapetaua after November 6, 1986.[17]

The IRCA also contains a "grandfather" provision that exempts employers from IRCA violations for employees hired before the IRCA's enactment.

GRANDFATHER PROVISION FOR CURRENT EMPLOYEES

(A) SECTION 274(a)(1) of the Immigration and Nationality Act [8 U.S.C. 1324a(a)(1)] shall not apply to the hiring, or recruiting or referring of an individual for employment which has occurred before the date of the enactment of this Act [Nov. 6, 1986].

(B) Section 274A(a)(2) of the Immigration and Nationality Act shall not apply to continuing employment of an alien who was hired before the date of the enactment of this Act.

Pub.L. No. 99–603, § 101(a)(3), 1986 U.S. Code Cong. & Admin.News (100 Stat.) 3372; 8 U.S.C. § 1324a (note). The regulations set forth the test to determine whether an employee has lost his or her grandfather status.

[A]n employee who was hired prior to November 7, 1986 shall lose his or her pre-enactment status if the employee:

(1) Quits; or

(2) Is terminated by the employer; the term termination shall include, but is not limited to, situations in which an employee is subject to seasonal employment; or

(3) Is excluded or deported from the United States or departs the United States under a grant of voluntary departure.

8 C.F.R. § 274a.7(b). Maka argues that Kapetaua was a grandfathered employee and therefore Maka was not subject to the requirements of the IRCA with respect to the hiring of Kapetaua. The ALJ found that the evidence established that Maka continuously employed Kapetaua "from prior to November 6, 1986, until approximately March 1988, as either a tree trimmer, ground maintenance man, or agricultural worker." Consequently, Kapetaua was a grandfathered employee and Maka did not violate the IRCA with respect to Kapetaua's employment. The CAHO reversed, holding that the record did not support the ALJ's conclusion. As stated above, this court reviews the CAHO's decision under the substantial evidence standard.

The CAHO held that the record clearly establishes that Kapetaua quit working for Maka, both as a tree trimmer and as a farmhand,[18] to work for a new employer, Isileli ("Isi") Fantupo. The CAHO based this holding on Kapetaua's testimony that he started work for Maka in 1983 as a tree trimmer, but later quit to work full time for another employer. The CAHO rejected the ALJ's conclusion that "[a]lthough Kapetaua testified that he quit Maka's as a tree trimmer, there is no evidence that he

---

**17.** At oral argument, Maka's counsel argued for reversing the determination that there was no good faith defense on the basis of Maka's reliance on the advice of counsel. At the court's request, counsel submitted those portions of the record that supported this position. The court has reviewed these materials and concludes that they do not affect our decision.

**18.** As the CAHO stated:

While the record is clear regarding the fact that Kapetaua quit working for Maka's, the date he quit and the date he was rehired by

Maka's are not clearly established in the record. The record, however, does indicate that Kapetaua quit Maka's sometime in December of 1986 ... and was rehired by Maka's sometime after June of 1987. The dispositive issue regarding Kapetaua's 'grandfathered' status is whether he 'quit' Maka's within the meaning of the regulation some time after November 6, 1986. The evidence indicates that he did 'quit' Maka's after such date, therefore, the exact date on which he quit is not critical.

quit working on the farm or piggery from prior to November 6, 1986 to March 1988."

First, the CAHO cited Kapetaua's testimony as evidence that Kapetaua had quit working on the farm. The ALJ apparently did not consider this testimony as evidence that Kapetaua had quit working on the farm. Further, although Kapetaua's testimony is confused as to the specific period of time that he worked for Isi, the ALJ did not rule that his testimony was not credible. In fact, the ALJ accepted Kapetaua's testimony that he quit working for Maka as a tree trimmer. Therefore, since the ALJ made no credibility finding with respect to Kapetaua's testimony, the CAHO's consideration of Kapetaua's testimony was not a rejection of the credibility findings of the ALJ.

Second, the CAHO held that the ALJ had "placed undue weight on Mr. Tukutau's testimony in reaching [the] conclusion that Kapetaua continued to work at Maka's farm and piggery from November 1986 to March 1988." The CAHO discounted this testimony because 1) there was no evidence in the record that Kapetaua received wages or other remuneration for farm work during this period; and 2) "the farm was a place where Tongans could fraternize rather than a business enterprise." Therefore, Kapetaua's mere presence at the farm did not establish that an employment relationship existed between Kapetaua and Maka.[19]

Further, the nature of Maka's employment practices also supports the CAHO's conclusion. Maka's business depends upon winning bids on government contracts to trim trees. Maka hires employees under oral contracts based upon specific job requirements. Employees work on a particular job in an informal employment-at-will arrangement. Generally, Maka's foremen confirm on a daily basis the names of the men who had worked that day and the number of hours worked. When the work on a particular job is complete, the employees go to another job whenever the next job comes up. In between jobs, employees are not on retainer. Employment with Maka can be sporadic and irregular. Maka's employees generally have no assurance of regular and continuous employment. Additionally, Maka does not expect an employee to forego other employment and remain on-call. Thus, Maka's employment practices could reasonably be characterized as providing a new oral contract of employment to each employee who works on a new job, at the time the new job comes up.

There is substantial evidence in the record to support the CAHO's conclusion that Kapetaua quit his employment with Maka at some point after the IRCA's enactment. Therefore, Kapetaua forfeited his "grandfathered employee status" under § 274A(a)(3).

Maka next argues that Kapetaua maintained his grandfathered status under IRCA because although Kapetaua worked for other employers during 1987, he remained an employee of Maka. In other words, Maka loaned Kapetaua to other employers. The test of an employer-employee relationship is the employer's right to control the employee's actions. *See* Restatement (Second) of Agency § 220(1). The CAHO held that "Maka did not have the right to control Kapetaua during the time he worked for Isi." Substantial evidence, specifically Maka's testimony that he relinquished his power to supervise and direct employees loaned to other employers, supports the CAHO's finding.

## IV

## CONCLUSION

First, the CAHO authority to review the ALJ's decisions is subject to the provisions

---

19. Maka's testimony supports this position. When asked whether an employee's mere presence at the farm constituted work, Maka replied "I cannot counting the farm. Because that's not job." The farm was reminiscent of Tongan village life. When the workday ended and on weekends, the farm provided the Tongans a place to engage in social and cultural activities that Maka described as "99 percent Tongan life." This and other evidence in the record supports the CAHO's conclusion that "Kapetaua and Maka may have maintained a social relationship, which at times was more akin to a familial relationship" rather than a continuous employment relationship from November 6, 1986 until 1988.

of the APA. Therefore, the CAHO does not have standardless discretion to reverse the ALJ's findings. Second, the statutory requirements of the IRCA do not violate due process. The IRCA provides for a full evidentiary hearing before an employer is deprived of a property interest. Third, the INS did not violate due process or the IRCA's personal service requirements when serving Maka with the Notices of Inspection. In the IRCA's statutory scheme, the issuance of the Notice of Intent to Fine initiates adjudicatory proceedings and triggers the personal service requirements of the statute. The Notice of Intent to Fine, in this case, was both properly served on Maka's attorney and incorporated in a properly served complaint. Fourth, the record contains adequate evidence that the CAHO considered all relevant factors to support the penalty assessed against Maka. Fifth, the INS issued a valid warning citation prior to issuing the Notice of Intent to Fine. Therefore, the INS complied with the statutory requirements of the partial enforcement period. Finally, substantial evidence supports the CAHO's decision that Maka violated §§ 1324a(a)(1)(A) and 1324a(a)(1)(B) of the Act. Maka knowingly hired Kapetaua for employment after November 6, 1986 and failed to comply with the employer verification requirements. Further, substantial evidence supports the CAHO's finding that Kapetaua was not a grandfathered employee for purposes of the Act. Therefore, the decision of the CAHO is affirmed.

AFFIRMED.