**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ALVIN W. GEBHART, JR.; DONNA T.
GEBHART,
                    *Petitioners,*

            v.

SECURITIES AND EXCHANGE
COMMISSION,

                    *Respondent.*

No. 08-74943

SEC No.
CRD1005905

OPINION

On Petition for Review of an Order of the
Securities & Exchange Commission

Submitted December 1, 2009*
Pasadena, California

Filed February 17, 2010

Before: Harry Pregerson, Michael Daly Hawkins and
Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

---

*The panel unanimously finds this case suitable for decision without
oral argument. *See* Fed. R. App. P. 34(a)(2).

## COUNSEL

Charles F. Goria, Goria, Weber & Jarvis, San Diego, California, for the petitioners.

David M. Becker, Mark D. Cahn, Jacob H. Stillman, Randall W. Quinn, William K. Shirey, Securities and Exchange Commission, Washington, D.C., for the respondent.

---

## OPINION

FISHER, Circuit Judge:

Alvin W. and Donna T. Gebhart petition for review of an order by the Securities and Exchange Commission (SEC) sustaining a disciplinary action by the National Association of Securities Dealers (NASD).[1] The NASD found that the Gebharts, securities salespersons, committed securities fraud in violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 by making false statements to clients in connection with the sale of promissory notes used to finance the conversion of mobile home parks to resident ownership. The SEC upheld the NASD's disciplinary action, concluding that the Gebharts acted with scienter because they made "representations to their clients despite not knowing whether they were true or false." We hold that the SEC applied the correct scienter standard and that substantial evidence supports the SEC's conclusion that the Gebharts acted with scienter. We therefore deny the petition for review.

## I.  BACKGROUND

Alvin Gebhart has been in the securities industry since 1983.[2]

---

[1]The NASD is now the Financial Industry Regulatory Authority (FINRA).

[2]In May 1983, Gebhart registered with the NASD as an investment company products and variable contracts representative ("IC representa-

In 1994, he began working at Mutual of New York (MONY) in San Diego, where he sold annuities and mutual funds. While at MONY, Gebhart met Jack Archer, a fellow MONY salesperson. In 1995, Archer told Gebhart about a business venture, Community Service Group (CSG), run by James Scovie. CSG was in the business of converting mobile home parks to resident ownership. CSG purchased parks from the owners and then assisted residents in purchasing them. In late 1996, Scovie and another person, David Mounier, created MHP Conversions, LLC (MHP) to facilitate the conversion process. MHP issued promissory notes that were sold to individual investors to raise funds for CSG's purchase of the parks. The MHP notes had one-year terms with fixed interest rates of 18 percent for new investments and 14 percent for reinvested funds. Each note stated that it would "ultimately be secured by a deed of trust" on the particular park to be purchased with the funds, but that "[u]ntil such time as said deed of trust is recorded, the sole asset of [the issuer] will be a deed of trust for the property known as Eastern Trailer Park."

Archer told Gebhart about the MHP program and asked Gebhart whether any of his clients were interested in invest-

tive") with the Prudential Insurance Company of America. In January 1996, he became associated with Mutual Service Corporation (MSC), a NASD member, as an IC representative. In December 1997, he passed the Series 7 general securities representative qualifying examination and became associated with MSC as a general securities representative.

Donna Gebhart registered with the NASD through Pacific Mutual as an IC representative on February 13, 1996. On February 14, 1996, she became associated with MSC as an IC representative. In April 1998, she passed the Series 7 qualifying examination and became associated with MSC as a general securities representative.

In August 2000, MSC terminated the Gebharts' registrations. The Gebharts subsequently registered as general securities principals, general securities representatives and IC representatives with Sentra Securities Corporation, another NASD member. They were associated with Sentra at the time of the NASD disciplinary proceedings that are the subject of this case.

ing. Gebhart arranged for Archer to make a presentation of the MHP program to three of his clients, all of whom made investments in the program. Archer earned a sales commission, and paid half of the commission to Gebhart.

In early 1996, Gebhart moved from MONY to another financial services firm, Mutual Service Corporation (MSC), a broker-dealer and member of the NASD. His wife, Donna Gebhart, joined him at MSC and the two opened and operated a MSC branch in Rancho Bernardo, California, where they sold insurance and annuities and provided financial planning services to clients. In October 1996, Archer approached the Gebharts about selling MHP notes to their MSC clients. The Gebharts met with Archer for about 40 minutes. Archer told them that the MHP program had been approved by the compliance officer at Archer's firm, MONY. This was not true, however. Archer also told the Gebharts "that the parks were in good shape and he always assured us that they had a lot of equity in them. He said they [were] 45 to 55 percent leveraged."

The Gebharts conducted no independent investigation into the MHP program, either in 1996 or over the next four years, during which time they sold MHP notes to their clients. They failed to obtain any financial statements for CSG or MHP, ascertain who were the owners, officers or shareholders of CSG or MHP, determine what compensation would be paid to CSG or MHP or their officers, verify that trust deeds securing the notes were being recorded or obtain copies of recorded trust deeds. They visited two of the mobile home parks subject to the notes, but those visits do not appear to have served any useful purpose. When Archer would approach the Gebharts with the opportunity for clients to invest in a new park conversion, they conducted no independent analysis of the park in question. Rather, "[i]t was always our understanding that they wouldn't have done a conversion on a park that wasn't — had good cash flow and that would be a deal worth them doing." Although the Gebharts believed that their cli-

ents' loans would be secured by second trust deeds, they did not inquire why they were not first trust deeds or who held the first trust deeds. In lieu of an independent investigation, the Gebharts relied on Archer's representations. As Alvin Gebhart explained:

> Throughout our four-year relationship, Mr. Archer continually stressed the strength of this program. Even in February [2000] when he spoke to Mr. Dave Mounier, the other principal [in MHP], he indicated that the parks were deep with equity. Donna and I had continuously interviewed Mr. Archer about the economics of this program. Initially, we were assured that the parks were financed only to 55% of value. Moreover, the monthly rents paid by the homeowners supplied working capital to Community Service Group. Indeed, we were assured that Community Service Group would not even consider a conversion of a park unless it had sufficient rents to pay all costs and interest to the Noteholders.

Donna Gebhart confirmed that she and her husband had simply relied on Archer's representations about the MHP program:

> [Archer] basically explained the program [at the October 1996 meeting]. I don't remember all of the details, but he went over it and I just wanted to be sure that — I wanted to make sure that these notes or trust deeds were secured and he assured us many times that they were always secured . . . . I remember he sort of went through the program. I don't remember word-for-word what the man said, but he came to us and he was a pension administrator, a Pacific Life former manager, and we always looked at him as being probably further up in the — obviously more experienced in stuff than we had.

Between the Gebharts' meeting with Archer in October 1996 and CSG's collapse in 2000, the Gebharts sold nearly $2.4 million in MHP promissory notes to 45 of their clients, earning about $105,000 in commission fees.[3] The sales were based on several statements by the Gebharts that, it later became clear, were false. The Gebharts told their clients that the MHP notes were a proven investment that offered substantial returns and were secured by recorded deeds of trust. They said that in the worst case scenario their clients would be part owners of the mobile home parks and would be able to recover their investments. In fact, the trust deeds were not recorded and the parks were significantly overencumbered. The Gebharts failed to disclose that their statements were based on information provided by Archer rather than their own, independent investigation.

CSG and MHP collapsed in the middle of 2000. In May, Scovie sent a letter to MHP noteholders explaining that an illness was forcing his absence from MHP and CSG. He disclosed that few of the deeds of trust purportedly securing the notes were recorded. In fact, there were approximately $3,670,000 in outstanding promissory notes, of which only $605,000 were secured by recorded deeds of trust. Gebhart admitted that "none of our clients' notes were recorded," and that the mobile home parks turned out to be "substantially overencumbered." At the time of MHP's collapse, the Gebharts' clients had over $1.5 million invested in outstanding MHP notes.[4] MSC terminated the Gebharts' employment in August 2000.

As a result of these events, in 2002 the NASD's Department of Enforcement filed a complaint against the Gebharts

---

[3]The Gebharts also invested thousands of dollars of their own funds in the notes between 1996 and 1999.

[4]The Gebharts' clients pursued a number of remedies, with the apparent support of the Gebharts, and were eventually able to recover about 84 percent of their investments.

for securities fraud.[5] The NASD asserted that the Gebharts had made materially false and misleading statements to their clients, in violation of section 10(b) of the Securities Exchange Act of 1934, SEC Rule 10b-5 and NASD Conduct Rule 2120.[6] A NASD hearing panel found that the Gebharts had acted in good faith and therefore rejected the fraud charges, but the NASD National Adjudicatory Council (NAC) reversed. The NAC found that the Gebharts had committed fraud, imposed a lifetime bar on Alvin Gebhart and imposed a one-year suspension and a $15,000 fine on Donna Gebhart. The SEC upheld the NASD decision in 2006.

The Gebharts petitioned for review of the SEC decision. We vacated and remanded in an unpublished decision, *Gebhart v. SEC*, 255 Fed. App'x 254, 2007 WL 4144635 (9th Cir. Nov. 21, 2007), out of concern that the Commission had applied a purely objective scienter standard that disregarded the Gebharts' actual state of mind. We remanded for reconsideration of the question of scienter and instructed the SEC to give careful consideration to the Gebharts' claims that, notwithstanding their objectively unreasonable conduct, they had acted in good faith.

On remand, the SEC once again determined that the Gebharts had acted with scienter and reaffirmed the NASD decision. The Gebharts have again petitioned for review. We have jurisdiction under 15 U.S.C. § 78y(a)(1), and deny the petition.

---

[5]In addition to the fraud claims, the NASD complaint alleged that the Gebharts had offered and sold unregistered securities, in violation of NASD Conduct Rule 2110, and engaged in private securities transactions, in violation of Conduct Rules 2110 and 3040. The NASD found that the Gebharts had indeed violated these provisions and the SEC affirmed the NASD's findings. The Gebharts do not contest those findings in this appeal. Only the fraud charges are at issue here.

[6]NASD Conduct Rule 2120 provides: "No member shall effect any transaction in, or induce the purchase or sale of, any security by means of any manipulative, deceptive or other fraudulent device or contrivance."

## II. SCIENTER

The Gebharts challenge the SEC's finding of scienter on two bases. First, they contend that the SEC applied an erroneous legal standard for scienter. Second, they contend that the SEC's finding of scienter is not supported by substantial evidence. We reject their contentions.

### A.

The first question is whether the SEC applied the correct scienter requirement applicable to a claimed violation of section 10(b) and Rule 10b-5. We review de novo the SEC's conclusions of law.[7]

Section 10(b) of the Securities Exchange Act of 1934 states, in relevant part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j. SEC Rule 10b-5, which implements section 10(b), provides that it is unlawful "[t]o employ any device,

---

[7]"The Commission's conclusions of law are to be set aside if arbitrary, capricious, or otherwise not in accordance with law." *Ponce v. SEC*, 345 F.3d 722, 728 (9th Cir. 2003) (quoting *Rutherford v. SEC*, 842 F.2d 214, 215 (9th Cir. 1988)) (internal quotation marks omitted).

scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a). It also declares it unlawful "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." *Id.* § 240.10b-5(b).

**[1]** To establish a violation of section 10(b) and Rule 10b-5, the SEC is required to "show that there has been a misstatement or omission of material fact, made with scienter." *Ponce v. SEC*, 345 F.3d 722, 729 (9th Cir. 2003) (quoting *SEC v. Fehn*, 97 F.3d 1276, 1289 (9th Cir. 1996)) (internal quotation marks omitted); *see also SEC v. Rana Research, Inc.*, 8 F.3d 1358, 1364 (9th Cir. 1993) (discussing the elements the SEC must prove to establish a misrepresentation violating Rule 10b-5).[8] "The plaintiffs may establish scienter by proving either actual knowledge or recklessness." *In re Software Toolworks Inc.*, 50 F.3d 615, 626 (9th Cir. 1994); *see Ponce*, 345 F.3d at 729 ("[S]cienter may be established by demonstrating that the defendant acted recklessly." (citing *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990) (en banc))).

Scienter may be established, therefore, by showing that the defendants knew their statements were false, or by showing that defendants were reckless as to the truth or falsity of their

---

[8]The elements of a section 10(b) or Rule 10b-5 claim vary depending on the identities of the parties and the nature of the relief sought. In a *private* securities fraud action, the plaintiff generally must prove five elements: (1) a material misrepresentation or omission of fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) transaction and loss causation; and (5) economic loss. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009). Our focus here is on the elements that the SEC must establish. The fourth and fifth elements of a private claim are therefore inapplicable. In this case, moreover, only the scienter element is at issue. The Gebharts do not dispute that their statements were material or in connection with the sale of securities, and, for the reason given in Part III, they have not preserved their claim that their statements were not false.

statements. *See Ponce*, 345 F.3d at 729-30 (scienter is established where defendants make "statements that they know, or are reckless in not knowing, are false"); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1085 (9th Cir. 2002) (scienter is established where "the defendant made false or misleading statements either intentionally or with deliberate recklessness"), *abrogation on other grounds recognized by South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *United States v. Farris*, 614 F.2d 634, 638 (9th Cir. 1979) ("[T]he reckless disregard for truth or falsity is sufficient to sustain a finding of securities fraud.").[9]

This familiar definition of scienter in a securities fraud case based on a misrepresentation is recognized not only in this circuit but in others as well. In *SEC v. Lyttle*, 538 F.3d 601, 603 (7th Cir. 2008), for example, Judge Posner explained that to establish scienter the SEC was required to show that "the defendants either knew that the representations they made to investors were false or were reckless in disregarding a substantial risk that they were false." *See also South Cherry Street, LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) ("This Court has also long held that the scienter element can be satisfied by a strong showing of reckless disregard for the truth."); *Levinson v. Basic Inc.*, 786 F.2d 741, 749 (6th Cir. 1986) ("Scienter, a traditional element of a section 10(b) and Rule 10b-5 action, can be proven by a showing that the defendants issued false or misleading . . . statements with knowledge that those statements were false or misleading, or with reckless disregard as to their false or misleading character.") (citation omitted), *vacated on other grounds*, *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). It is also consistent with

---

[9]In some circumstances not relevant here, the Private Securities Litigation Reform Act (PSLRA) requires a showing that the defendants knew their statements were false. *See* 15 U.S.C. § 78u-5(c)(1)(B)(i) (requiring "actual knowledge . . . that the statement was false or misleading" in private securities actions challenging forward-looking statements). The claims in this case are not covered by the PSLRA, so scienter can be established by either knowledge or recklessness.

traditional common law principles. *See generally* Restatement (Second) of Torts § 526 (1977) (permitting scienter to be established by showing either knowledge or conscious reckless-ness).[10]

**[2]** "Scienter can be established by direct or circumstantial evidence." *Provenz v. Miller*, 102 F.3d 1478, 1490 (9th Cir. 1996). In *Hollinger*, we explained that the objective unreason-ableness of a defendant's conduct may give rise to an infer-ence of scienter:

> [R]eckless conduct may be defined as . . . an extreme departure from the standards of ordinary care, . . . which presents a danger of misleading buyers or sell-ers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Hollinger*, 914 F.2d at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir. 1977)) (first alteration in original).

**[3]** Scienter, however, is a subjective inquiry. It turns on the defendant's actual state of mind. *See* 8 Louis Loss & Joel Seligman, *Securities Regulation* 3676 (3d ed. 2004). Thus, although we may consider the objective unreasonableness of the defendant's conduct to raise an inference of scienter, the ultimate question is whether the defendant knew his or her statements were false, or was consciously reckless as to their truth or falsity. *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 206 (1976) ("There is no indication that Congress intended anyone to be made liable for such practices unless he

---

[10]The conclusion that we require either knowledge of falsity or con-scious recklessness is supported by our decision in *In re Silicon Graphics Inc. Securities Litigation*, 183 F.3d 970 (9th Cir. 1999), *abrogation on other grounds recognized by South Ferry LP*, 542 F.3d at 784, where we explained that, in the securities fraud context, scienter requires "deliberate recklessness," which we defined as conduct reflecting "some degree of intentional or conscious misconduct." *Id.* at 977.

acted other than in good faith."); *Hollinger*, 914 F.2d at 1570 (scienter requires "something more egregious than even 'white heart/empty head' good faith." (quoting *Sundstrand*, 553 F.2d at 1045) (internal quotation marks omitted)); *Kaplan v. Rose*, 49 F.3d 1363, 1379-81 (9th Cir. 1994) (applying good faith standard); *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1425 (9th Cir. 1994) (same); *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1117-18 (9th Cir. 1989) (same); *cf.* Restatement (Second) of Torts § 526 cmt. d ("The fact that the misrepresentation is one that a man of ordinary care and intelligence in the maker's situation would have recognized as false is not enough to impose liability . . . , *but* it is evidence from which his lack of honest belief may be inferred." (emphasis added)).[11]

## B.

The Gebharts contend that the SEC applied an erroneous scienter standard in this case by focusing exclusively on *Hollinger*'s objective inquiry and disregarding evidence of sub-

---

[11]Our decision in *Kaplan* is illustrative of the respective roles played by the objective and subjective components of the scienter inquiry. We began by citing *Hollinger* and observing that scienter can be established by showing an extreme departure from the ordinary standards of care and an obvious danger of misleading investors. 49 F.3d at 1378. But we also observed that several defendants had submitted sworn declarations testifying that they believed in good faith that their statements were true. *Id.* at 1379. The plaintiff argued that he had presented sufficient evidence of scienter to survive summary judgment because "[t]hese statements are so false that defendants must have known they were false and must have intended to mislead the public." *Id.* We disagreed, explaining that plaintiff's argument "does not suffice to rebut the declarations of good faith made by the defendants." *Id. Kaplan* shows that the objective unreasonableness of the defendant's actions may raise an inference of scienter, but the factfinder must consider the direct and circumstantial evidence as a whole to determine whether the defendant knew his or her statements were false, or consciously disregarded the risk that they were false. *See Kaplan*, 49 F.3d at 1379-80; *Worlds of Wonder*, 35 F.3d at 1424-25; *Apple*, 886 F.2d at 1117-18. In *Kaplan*, as to those particular defendants, the evidence as a whole was insufficient to survive summary judgment.

jective good faith. We disagree. The SEC considered all of the evidence bearing on the Gebharts' actual state of mind, including the Gebharts' extreme departure from ordinary standards of care, and found that the Gebharts were consciously aware of the risk that their statements were false. There was no error.

The SEC certainly considered the objective unreasonableness of the Gebharts' actions as *part* of its analysis. The SEC found that the Gebharts' failed to perform any meaningful investigation into the MHP promissory notes — an extreme departure from ordinary standards of care that "created the substantial [and obvious] risk . . . that their representations were not true." The SEC found that the Gebharts "made no effort to investigate or understand why their clients were being sold second (and not first) deeds of trust; no effort to identify the first trust deed holders or the amounts of those outstanding trust deeds; and no effort to ensure their clients' investments were actually being secured by recorded trust deeds." The Gebharts made "no effort" to corroborate Archer's representations that the parks were not overly encumbered.

**[4]** The SEC properly considered the objective unreasonableness of the Gebharts' actions as some evidence supporting the inference that the Gebharts acted with scienter, but did not treat it as dispositive. The Commission recognized that scienter turns on "an actor's actual state of mind at the time of the relevant conduct." It considered the Gebharts' arguments that they acted in good faith and took into account "the Gebharts' assertions that they believed they had done enough to confirm the truthfulness of their statements to clients." It evaluated "the evidence the Gebharts put forward to demonstrate their good faith beliefs" as "part of the complete mix of facts bearing on an evaluation of their [actual] state of mind" and concluded that the "[e]vidence from the Gebharts about their subjective belief [wa]s not sufficient to overcome" the inference of scienter created by the evidence as a whole. The

Gebharts' assertions of good faith were "not plausible" and lacked "credibility." Based on the evidence as a whole, the SEC determined that the Gebharts "knew they had no direct knowledge of the truth or falsity" of their statements, and made their statements "despite not knowing whether they were true or false." The SEC correctly applied the appropriate scienter standard.

## C.

The Gebharts also argue that the SEC's finding that they acted with scienter is not supported by substantial evidence. We disagree.

The SEC's factual findings are reviewed for substantial evidence. *Ponce*, 345 F.3d at 728. The substantial evidence standard also applies to the SEC's finding of scienter. *Vernazza v. SEC*, 327 F.3d 851, 859 (9th Cir.), *amended by* 335 F.3d 1096 (9th Cir. 2003). Substantial evidence means more than a mere scintilla but less than a preponderance; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *NLRB v. Int'l Bhd. of Elec. Workers, Local 48*, 345 F.3d 1049, 1053-54 (9th Cir. 2003). The standard is "extremely deferential" and a reviewing court must uphold the agency's findings "unless the evidence presented would *compel* a reasonable finder of fact to reach a contrary result." *Monjaraz-Munoz v. INS*, 327 F.3d 892, 895 (9th Cir.), *amended by* 339 F.3d 1012 (9th Cir. 2003) (quoting *Singh-Kaur v. INS*, 183 F.3d 1147, 1149-50 (9th Cir. 1999)) (internal quotation marks omitted). If the evidence is susceptible to more than one rational interpretation, we may not substitute our judgment for that of the agency. *Bear Lake Watch, Inc. v. Fed. Energy Regulatory Comm'n*, 324 F.3d 1071, 1076 (9th Cir. 2003).

The Gebharts point out that there is *some* evidence supporting an inference that they genuinely believed that they had an adequate basis for their statements. Significantly, the Geb-

harts themselves invested substantially in the MHP notes. *See* 8 Loss & Seligman, *supra*, at 3691 n.558 ("[I]nvestment of one's own money tends to negate scienter, since it 'belies any known or obvious danger.' " (quoting *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 517 (1st Cir. 1978))). The Gebharts also may have sincerely, if mistakenly, believed that MONY and MSC had approved the MHP program.

**[5]** Substantial evidence, however, supports the SEC's finding of recklessness. The Gebharts represented that the MHP notes were a good investment, that they were secured by recorded trust deeds and that in the event of a problem investors would be able to get their investments back because the parks were not heavily leveraged. The Gebharts based these statements on representations by Archer and conducted no meaningful independent investigation to confirm the truth of their representations.[12] It was therefore reasonable for the

---

[12]The Gebharts contend that they conducted an adequate investigation into the MHP program and that they sincerely believed they had a reasonable basis for their statements that the MHP notes were secured and that the parks were not overencumbered. In addition to their own purchases of MHP notes, they point to (1) their mistaken belief (based on Archer's statements) that MONY had approved the MHP program; (2) their having informed MSC's compliance officer about the MHP program and receiving no objection in response; (3) their belief that third party banks would confirm that deeds of trust were being recorded; (4) the absence of any problems with payments on the notes prior to 2000; (5) their visits to two mobile home parks that were part of the program; and (6) statements by clients that the Gebharts never intended to deceive them. They also rely on the NASD hearing panel's finding that they "truly believed that they had fulfilled their responsibilities to assure that MHP and CSG were appropriate investments." The SEC reasonably discounted most of this evidence. The Gebharts failed to confirm Archer's claim that MONY had approved the MHP program and the Gebharts acknowledge that MSC never formally approved the program. Whether clients believed the Gebharts intended to deceive them — there is no evidence in the record that the Gebharts ever intended to defraud anyone — is irrelevant to whether the Gebharts made statements *recklessly*. The Gebharts' visits to the two parks afforded them no information about whether the parks were overencumbered or the trust deeds were recorded. The SEC found no credibil-

SEC to infer that the Gebharts were consciously aware that they lacked sufficient information for their statements. *See* Restatement (Second) of Torts § 526 (1977) ("A misrepresentation is fraudulent if the maker . . . does not have the confidence in the accuracy of his representation that he states or implies, or . . . knows that he does not have the basis for his representation that he states or implies."). By asking the court to draw inferences different from those reasonably drawn by the SEC, the Gebharts misapprehend the nature of our review. *See Vernazza*, 327 F.3d at 861. We may not substitute our judgment for the reasonable judgment of the Commission. *See Ponce*, 345 F.3d at 728 ("If . . . the evidence is open to more than one interpretation, we are required to uphold the SEC's finding.").

### III.   REMAINING ISSUES

**[6]** The Gebharts' remaining contentions are unpersuasive. The SEC adequately explained its determination not to defer to the NASD hearing panel's finding that the Gebharts acted in good faith by offering detailed, specific reasons supported by substantial evidence for rejecting the hearing panel's finding. *See Maka v. INS*, 904 F.2d 1351, 1355 (9th Cir. 1990), *amended by* 932 F.2d 1352 (9th Cir. 1991). The Gebharts waived their challenges to the SEC's factual findings (that the trust deeds were not recorded and that the parks were over-encumbered) by failing to raise them in their prior appeal. *See In re Cellular 101, Inc.*, 539 F.3d 1150, 1155-56 (9th Cir. 2008). The SEC did not abuse its discretion by imposing a lifetime bar on Alvin Gebhart. *See Ponce*, 345 F.3d at 740-41.

**PETITION DENIED.**

---

ity in the Gebharts' claims that they relied on third-party banks to ensure the validity of the MHP program and the recording of trust deeds. The hearing panel's finding of good faith was reversed by the NASD National Adjudicatory Council. Our role is not to weigh the evidence for ourselves but to determine whether the SEC reached *a* reasonable conclusion. We cannot say that it did not do so.