Alberto NORIEGA–PEREZ, Petitioner,

v.

UNITED STATES of America, Respondent.

No. 96–70513.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 9, 1998.

Filed June 9, 1999.

Rehman H. Bashey and Michael B. King, Lane, Powell, Spears & Lubersky, Seattle, Washington, for the petitioner.

Francis W. Fraser and Jennifer H. Zawid, Office of Immigration Litigation, United States Department of Justice, Washington, D.C., for the respondent.

Before: FERGUSON and REINHARDT, Circuit Judges, and ROLL, District Judge.*

* The Honorable John M. Roll, District Judge for the District of Arizona, sitting by designation.

ROLL, District Judge:

Petitioner Alberto Noriega–Perez appeals from a summary decision of an Administrative Law Judge (ALJ) imposing a monetary fine for civil document fraud. The civil action was commenced after Noriega–Perez had entered a plea of guilty to conspiracy to possess forged, counterfeit, and false documents. The summary decision is affirmed.

## I. Background

On December 2, 1992, Noriega–Perez was indicted in the District Court for the Southern District of California for conspiracy to possess forged, counterfeit, and false immigration documents. Thereafter, Noriega–Perez entered a plea of guilty to one count of "Conspiracy to Possess Forged, Counterfeit, and False Documents" in violation of 18 U.S.C. §§ 371 and 1546. The district court accepted the guilty plea, fined Noriega–Perez $20,000, and sentenced him to 18 months of imprisonment, followed by three years of supervised release. Noriega–Perez did not file an appeal, but his sentence was reduced in June 1994 to time served and the fine reduced to $5,000 pursuant to a petition for a writ of habeas corpus.

Two months after Noriega–Perez's guilty plea, the Immigration and Naturalization Service (INS) issued a Notice of Intent to Fine (Notice) him for civil document fraud in violation of 8 U.S.C. § 1324c. The conduct alleged in the Notice-forging temporary immigration documents and possessing fraudulent immigration forms and social security cards-was related to the conduct that underlaid Noriega–Perez's guilty plea for conspiracy to commit document fraud. The INS sought to order Noriega–Perez to cease and desist from his unlawful action and to pay a "civil money penalty" of $176,000. Noriega–Perez filed a pro se response to the INS asserting that he had already been sentenced for the wrongful acts alleged in the Notice.

On January 23, 1995, the INS filed a two-count complaint with the Executive Office for Immigration Review (EOIR), Office of the Chief Administrative Hearing Officer (OCAHO), charging Noriega–Perez with document fraud pursuant to 8 U.S.C. § 1324c. The complaint alleged the same violations contained in the Notice and requested $96,000 in civil money penalties. Specifically, the United States charged that Noriega–Perez violated the Immigration and Nationality Act, 8 U.S.C. § 1324c, by (1) forging eight temporary immigration documents, (2) possessing 298 fraudulent INS Forms I–94, (3) possessing 21 fraudulent U.S. Social Security cards, and (4) possessing one fraudulent INS Form I–151. In his pro se response to the complaint, Noriega–Perez denied the allegations and affirmatively asserted, as one of multiple grounds for relief, that the fine constituted a second punishment for the same crime.

After a series of discovery motions and rulings, on October 27, 1995, the ALJ granted the INS's motion for summary decision on the merits. The ALJ then ordered the parties to submit briefs recommending appropriate penalties and addressing Noriega–Perez's claim that imposition of the fine would constitute double jeopardy.

In its brief to the ALJ, the INS sought a $96,000 fine. The INS based the fine amount on a memorandum prepared by special agent Alejandro Kastner of the Investigation Unit of the San Diego INS district office. Agent Kastner reported that the investigation of Noriega–Perez and his alleged coconspirators involved many hours of investigation by numerous units. The total cost of the investigation was approximately $48,000. The INS also denied that the imposition of a civil fine after the government had already imposed criminal punishment implicated the double jeopardy clause.

On November 15, 1995, Noriega–Perez filed a motion in response to the ALJ's request for additional briefing. He raised several arguments against the judgment including his previously-raised double

jeopardy claim and further asserted that the ALJ lacked subject-matter jurisdiction because ALJs are not Article III judges. Noriega–Perez also indicated that he could not recommend an appropriate penalty pursuant to the ALJ's order because he did not have sufficient information.

The ALJ issued his Final Decision and Order on March 2, 1996. The ALJ considered a number of factors before imposing a fine of $96,000. He considered Noriega–Perez's monetary motivation, failure to offer mitigating factors, and prior conviction for transferring counterfeit Federal Reserve notes. He also ordered Noriega–Perez to cease and desist from engaging in future document fraud.

In response to Noriega–Perez's legal arguments, the ALJ noted that the jurisdictional argument was not properly before him because the enabling statute did not give him the power to dismiss actions based on constitutional infirmities. Additionally, the ALJ found that under *United States v. Halper*, 490 U.S. 435, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989), the fine was remedial in nature and therefore did not violate the double jeopardy clause.

 Noriega–Perez now appeals from the ALJ's final order. Although he raises many issues, only the double jeopardy

claim and the Article III claim merit discussion.[1]

## II. Statutory Scheme

In an attempt to reduce the flow of illegal immigration into the United States, Congress enacted the Immigration Reform and Control Act of 1986 (IRCA). The purpose of IRCA was to "close the back door on illegal immigration so that the front door on legal immigration may remain open." *See* H.R.Rep. No. 101–723(i), at 46 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649–5650. Because it believed that "[e]mployment is the magnet that attracts aliens here illegally," *id.*, Congress made it unlawful for an employer knowingly to hire an unauthorized alien to work in the United States. *See* 8 U.S.C. § 1324a. IRCA also established an employment verification system which required employers to examine various documents establishing eligibility of employment, and to retain a verification form establishing the employee's eligibility. *See* 8 U.S.C. §§ 1324a(b)(1), (2), and (3).

In 1990, Congress strengthened IRCA by enacting 8 U.S.C. § 1324c. Section 1324c establishes a monetary penalty for those who knowingly forge an employment eligibility document, or use or possess such a falsely made document, in order to meet,

1. Noriega–Perez raises five other issues on appeal. First, he claims that the fine of $96,000 imposed upon him by the ALJ constitutes an excessive fine under the Eighth Amendment. This challenge fails because a fine of $96,000 for possessing and counterfeiting over 300 fraudulent documents is hardly "grossly disproportional" to the gravity of Noriega–Perez's offense, particularly considering the INS' assertion that its cost of investigation was approximately $48,000. *See United States v. Bajakajian*, 524 U.S. 321, 118 S.Ct. 2028, 2037–38, 141 L.Ed.2d 314 (1998). Second, Noriega–Perez asserts that it was improper for the ALJ to grant summary judgment because of his assertion of his Fifth Amendment right against self-incrimination. However, petitioner had no valid claim of Fifth Amendment privilege to assert, for he had already pleaded guilty to criminal charges based on his actions and thus could not be criminally prosecuted again. Even

assuming he did have a valid Fifth Amendment privilege, he failed to assert the basis of his fear of incrimination with the requisite specificity. *See Brunswick Corp. v. Doff*, 638 F.2d 108, 110 (9th Cir.1981). Third, Noriega–Perez complains that the ALJ improperly denied his motion for a continuance of the hearing. The ALJ had previously granted petitioner three extensions of time and did not abuse his discretion in denying the fourth such request. Fourth, petitioner claims that the ALJ erred in failing to order the INS to respond to a discovery request. Noriega–Perez has failed to show, however, that the documents he requested were relevant and could have affected the outcome of the summary judgment motion. Finally, petitioner contends that he was unconstitutionally denied a jury trial. It follows from our holding that an administrative hearing complies with the Constitution that a jury trial was not required.

or enable another person to meet, the employment eligibility requirements of chapter 12, Title 8 of the United States Code. *See* 8 U.S.C. §§ 1324c(a), (c)(3). Section 1324c grants the adjudication of cases arising under it to ALJs. *See* 8 U.S.C. §§ 1324c(d)(2), (5).

### III. Double Jeopardy

■ The Fifth Amendment to the United States Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V. Noriega–Perez asserts that his conviction followed by his civil fine violated the double jeopardy clause. We disagree.

The facts are undisputed. On May 10, 1993, Noriega–Perez entered a guilty plea to conspiracy to commit document fraud under the general conspiracy statute, 18 U.S.C. § 371. Thereafter, on May 2, 1996, Noriega–Perez was fined for document fraud pursuant to 8 U.S.C. § 1324c(a)(1)-(2). Noriega–Perez claims that under the standard announced in *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), the civil fine actually constituted a form of criminal punishment. Accordingly, he maintains, he could not be fined after having been convicted for the same acts.

Whether the civil penalty should be denominated criminal under *Hudson* is irrelevant, however, to resolving Noriega–Perez's double-jeopardy claim if the previous criminal conviction was for a different offense. *See id.* at 493 ("The [Double Jeopardy] Clause protects only against the imposition of multiple criminal punishments for the same offense." (emphasis omitted)). That is the case here; Noriega–Perez was first convicted of conspiracy to commit document fraud, not document fraud itself. Subsequently, his civil penalty was assessed for document fraud, not conspiracy to commit document fraud. It is clear that

no double jeopardy violation occurred because conspiracy to commit an offense and the offense itself are separate offenses that can be tried separately. *See United States v. Felix*, 503 U.S. 378, 390–91, 112 S.Ct. 1377, 118 L.Ed.2d 25 (1992); *Garrett v. United States*, 471 U.S. 773, 778, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985); *United States v. Saccoccia*, 18 F.3d 795, 798 (9th Cir. 1994); *United States v. Hoelker*, 765 F.2d 1422, 1427 (9th Cir.1985); *United States v. Brooklier*, 637 F.2d 620 (9th Cir.1981).[2]

Double jeopardy protections guarantee that the United States may not criminally punish Noriega–Perez twice for the same offense. The threshold question for double jeopardy purposes is whether the two offenses for which Noriega–Perez was punished are the same. They are not. Even if Noriega–Perez's fine imposed pursuant to section 1324c constituted a criminal penalty under *Hudson*, the double jeopardy clause is not violated.

### IV. Separation of Powers

Congress entrusted the adjudication of document fraud cases under section 1324c to ALJs. *See* 8 U.S.C. § 1324c(d)(2). *See also* 28 C.F.R. § 68 *et seq.* Noriega–Perez claims that this grant of jurisdiction violates the separation of powers because an Article III judge did not preside over his case. The issue of whether section 1324c's grant of jurisdiction to an ALJ violates the separation of powers involves a two-part inquiry into (1) whether the fine provided for in the statute is civil or criminal in nature, and (2) considering the nature of the fine, whether the grant of jurisdiction to an ALJ is constitutional.

### A. *Hudson* Inquiry

■■ Although the *Hudson* analysis of whether the fine at issue is civil or criminal in nature need not be reached in address-

---

2. Neither party discussed this aspect of the double jeopardy issue, perhaps because the majority did not address it in *Hudson*. Although Justice Stevens discussed this issue in his concurrence, the majority chose not to

address it because it had not been presented in the petition for certiorari. *Hudson*, 118 S.Ct. at 494 n. 5. Nevertheless this part of the double jeopardy inquiry remains a necessary part of double jeopardy analysis.

ing Noriega–Perez's double jeopardy claim, it must guide our discussion of his Article III claim because the classification of a sanction imposed by an ALJ as civil in nature is highly probative, although not necessarily determinative, of the constitutionality of the ALJ's jurisdiction.[3] Under *Hudson*, the first inquiry is whether the legislature "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or another." 118 S.Ct. at 493 (quoting *United States v. Ward*, 448 U.S. 242, 248, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980)). Congressional intent is clear here. Congress labeled section 1324c a civil sanction. *See* 8 U.S.C. § 1324c(d)(3) (classifying the sanction as a "civil money penalty").

■ Even where the legislature has indicated an intention to establish a civil penalty, whether the statutory scheme was "so punitive either in purpose or effect as to transform what was clearly intended as a civil remedy into a criminal penalty" must nevertheless be considered. *Hudson*, 118 S.Ct. at 493 (internal quotations and citations omitted). The legislative label of section 1324c will govern, however, unless seven "useful guideposts" show by the clearest proof that the civil penalty is so punitive that it is actually criminal in nature. *Id.*

■ The seven guideposts are whether the sanction (1) involves an affirmative disability or restraint, (2) has historically been treated as a criminal punishment, (3) requires a showing of scienter, (4) promotes the traditional aims of criminal punishment-retribution and deterrence, (5) applies to behavior which is already a crime,

(6) has an alternative non-criminal purpose, and (7) is not excessive in relation to the alternative purposes. *Id.* We consider each in turn.

### Affirmative Disability or Restraint

■ Monetary fines do not constitute an affirmative disability or restraint. *See Hudson*, 118 S.Ct. at 496. Although Noriega–Perez was also ordered to "cease and desist" his unlawful acts, this even more clearly does not fall within "affirmative restraint." *Id.* Nor does it constitute a disability as that term has been viewed historically for *Hudson* purposes. Accordingly, neither imprisonment, nor its equivalent, was imposed on Noriega–Perez.

### Historical Treatment

Monetary fines have not "historically been viewed as punishment." *Hudson*, 118 S.Ct. at 495. "[T]he payment of fixed or variable sums of money ... ha[s] been recognized as enforceable by civil proceedings since the original revenue law of 1789." *Id.* at 496 (citation omitted). In particular, monetary penalties for violations of immigration regulation, whether imposed on individuals or regulated companies, have historically been treated as civil in nature. *See Hepner v. United States*, 213 U.S. 103, 109–10, 29 S.Ct. 474, 53 L.Ed. 720 (1909) ("a civil action is an appropriate mode of proceeding" to collect a monetary penalty for knowingly inducing an alien "to migrate to the United States for the purpose of performing labor here"); *United States v. Atlantic Fruit Co.*, 206 F. 440, 440–42 (2d Cir.1913) (a civil fine could

---

3. The *Hudson/Kennedy* guideposts are pertinent to this inquiry because a finding that the sanction imposed by section 1324c is criminal would implicate the safeguards that attend a criminal prosecution. *See Austin v. United States*, 509 U.S. 602, 610 n. 6, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). Furthermore, the Supreme Court has previously utilized *Kennedy v. Mendoza–Martinez* to determine whether congressional action constituted punishment in the separation of powers context. *See Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 477, 97 S.Ct. 2777, 53 L.Ed.2d 867

(1977) (finding that a congressional Act did not violate the Bill of Attainder Clause because it did not impose a punishment). Significantly, the Supreme Court noted that "the Bill of Attainder Clause was an important ingredient of the doctrine of separation of powers." *Id.* at 470, 97 S.Ct. 2777. *See also United States v. Brown*, 381 U.S. 437, 442–43, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965) (noting that Article III and the Bill of Attainder Clause serve the separation of powers doctrine).

be maintained pursuant to a statute requiring steamship companies to post immigration laws); *Millon v. United States,* 219 F. 186, 186 (2d Cir.1914) (the government may impose a monetary penalty in a civil action for "knowingly assisting ... the migration or importation of any contract laborer into the United States").

Document fraud in the immigration context has been punishable since 1924. The 1924 statute criminalized the forging of reentry permits and levied fines of up to $10,000. *See* Act, ch. 190, § 21, 62 Stat. 862 (1924). The 1952 revision of the statute, codified at 18 U.S.C. § 1546, criminalized the fraud and misuse of visas, permits, and other immigration documents. Section 1546 provides that an individual convicted of immigration fraud shall be fined not more than $2,000, imprisoned up to five years, or both. In 1986, the potential fine for immigration fraud was increased to $250,000. Congress did not classify as civil a fine for immigration-related document fraud until 1990, when Congress enacted the statute at issue here, 8 U.S.C. § 1324c.

For the majority of its existence the criminal statute punishing document fraud allowed for the imposition of imprisonment as well as a fine. Section 1324c, however, provides only for the imposition of a fine. In *Hudson,* the Supreme Court resolved a similar situation. The criminal counterparts to the civil sanction at issue in that case also provided for fines, imprisonment, or both. *See* 18 U.S.C. §§ 371, 656, and 1005. Nevertheless, the Court found that the sanction at issue was historically civil. Accordingly, the historical treatment of the sanction imposed by section 1324c indicates that it is civil in nature.

### Scienter

The conduct prohibited requires a showing of scienter, which is a traditional requirement of criminal liability, before sanctions may be imposed. Section 1324c(a) prohibits a party from "knowingly" engaging in the specified conduct. This factor tends to support Noriega–Perez's claim that the fine is criminal in nature.

### Traditional Aims of Punishment

■■■ The traditional aims of criminal punishment are retribution and deterrence. There is no indication that section 1324c's provision for civil fines is intended to promote retribution, although as the government concedes, it is intended to have a deterrent effect. Although section 1324c may promote deterrence, "the mere presence of this purpose is insufficient to render a sanction criminal, as deterrence 'may serve civil as well as criminal goals.'" *Hudson,* 118 S.Ct. at 496 (citation omitted). The fines provision was also intended to serve a remedial purpose, namely, lessening the attractiveness of U.S. jobs to illegal immigrants. Accordingly, this factor is mixed.

### Behavior Which Has Been Criminalized

18 U.S.C. § 1546 criminalizes the precise conduct penalized in the instant case. This factor is not determinative, however, particularly given the amount of time that elapsed between the criminalizing of this conduct and the establishment of a civil penalty. Section 1324c was passed in 1990, while the comparative criminal sanction was originally enacted in 1924. *See* Act, ch. 190, § 21, 62 Stat. 862 (1924). As the Supreme Court noted in *United States v. Ward,* "the placement of criminal penalties in one statute and the placement of civil penalties in another statute enacted 70 years later tends to dilute the force of the fifth ... criterion." *Ward,* 448 U.S. at 250, 100 S.Ct. 2636 (finding that a monetary fine for an environmental offense was civil in nature despite the fact that the same conduct was subject to a criminal offense).

### Non–Criminal Purposes

Section 1324c furthers several non-punitive purposes, including (1) reimbursing the government for enforcement expenditures under the Immigration and Naturalization Act, 8 U.S.C. § 1330(3)(A), (2) ensuring that persons committing fraud ·do not profit from their acts, *see United*

*States v. Ursery,* 518 U.S. 267, 291, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), and (3) immigration regulation. *Cf. Cole v. U.S. Dep't of Agric.,* 133 F.3d 803, 806 (11th Cir.1998) (distinguishing between regulatory and criminal goals). *See also Immigration & Naturalization Service v. National Center for Immigrants' Rights,* 502 U.S. 183, 187–94, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991) (noting that IRCA expresses Congress' determination that employment of undocumented aliens was an important part of U.S. immigration law).

### Excessiveness of Penalty

The INS based its recommendation of a $96,000 fine in this case on the fact that the investigation of Noriega–Perez and his alleged coconspirators involved many hours of investigation by numerous agents, at a cost of approximately $48,000.

The imposition of a $96,000 civil fine for more than 300 fraudulent violations is not excessive in light of the Act's remedial purposes. *See United States v. Lippert,* 148 F.3d 974, 977 (8th Cir.1998) (fine not excessive where it was difficult to prove the government's damages and the government incurred investigative and enforcement costs).

In sum, evaluation under the seven *Hudson* factors is mixed. On balance the factors here do not demonstrate by the clearest proof that section 1324c's monetary sanction is so punitive that it is criminal in nature.[4] Accordingly, section 1324c imposes a civil, not criminal, sanction.

## B. Article III

■ Noriega–Perez asserts that the imposition of the fine by an ALJ pursuant to section 1324c violated the separation of powers. According to Noriega–Perez, such a fine could only have been imposed by an Article III judge. For the reasons set forth below, we disagree.

**4.** Although the dissent argues that the majority gives the *Hudson/Kennedy* guideposts too much deference, this application is consistent with many other appellate court opinions that have given the factors great weight. *See, e.g.,*

### 1. Background

■ "On its most fundamental plane, the separation of powers doctrine protects the whole constitutional structure by requiring that each branch retain its essential powers and independence." *Pacemaker Diagnostic Clinic of America v. Instromedix,* 725 F.2d 537, 544 (9th Cir.) (en banc), *cert. denied,* 469 U.S. 824, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984). Article III, section 1, of the U.S. Constitution provides in pertinent part:

> The judicial Power of the United States shall be vested in one supreme Court and in such inferior Court as the Congress may from time to time ordain and establish. The Judges of the supreme and inferior Courts, shall hold their Offices during good Behavior, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in office.

Because ALJs lack the characteristics of Article III judges, including life tenure, they are generally prohibited from exercising "judicial power." *See Simpson v. Office of Thrift Supervision,* 29 F.3d 1418, 1422 (9th Cir.1994), *cert. denied,* 513 U.S. 1148, 115 S.Ct. 1096, 130 L.Ed.2d 1064 (1995).

The resolution of disputes by non-Article III judges, such as ALJs, implicates serious concerns regarding our constitutionally established system of checks and balances. "A judiciary free from control by the Executive and the Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." *United States v. Will,* 449 U.S. 200, 218, 101 S.Ct. 471, 66 L.Ed.2d 392 (1980).

Importantly, however, "neither [the Supreme Court] nor Congress has read the

*Louis v. Commissioner of Internal Revenue,* 170 F.3d 1232 (9th Cir.1999); *Herbert v. Billy,* 160 F.3d 1131 (6th Cir.1998); *Securities and Exchange Comm'n v. Palmisano,* 135 F.3d 860 (2d Cir.1998).

Constitution as requiring every federal question arising under the federal law ... to be tried in an Art. III court." *Thomas v. Union Carbide Agric. Prods., Co.*, 473 U.S. 568, 582, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (quoting *Palmore v. United States*, 411 U.S. 389, 407, 93 S.Ct. 1670, 36 L.Ed.2d 342 (1973)). Congress began authorizing adjudication by agencies in 1789, when it empowered the Comptroller within the Treasury Department to resolve all disputes concerning claims against the Treasury. Since then, a line of Supreme Court cases has developed excepting certain actions from initial adjudication by an Article III body. The Supreme Court first validated the adjudication of a federal question by a non-Article III forum in 1828. *See American Ins. Co. v. Canter*, 26 U.S. 511, 1 Pet. 511, 7 L.Ed. 242 (1828) (upholding territorial court's authority to hear admiralty cases). Thereafter, in 1855, the Supreme Court articulated another exception to the general requirements of Article III adjudication, holding that a non-Article III forum could resolve disputes involving "public rights." *See Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 15 L.Ed. 372 (1855).

In *Northern Pipeline v. Marathon Pipe Line Co.*, the Supreme Court articulated three narrow classes of cases in which Article III concerns do not mandate resolution of federal disputes by Article III judges: (1) public rights; (2) territorial courts; and (3) military courts. 458 U.S. 50, 69, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Brennan, J; plurality). Although the boundaries of, as well as the importance of the distinction between, public and private rights for Article III purposes have shifted over the years, compare *Northern Pipeline*, 458 U.S. at 69, 102 S.Ct. 2858 with *Union Carbide*, 473 U.S. at 589, 105 S.Ct. 3325, and *Granfinanciera v. Nordberg*, 492 U.S. 33, 54–56, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989), the field of immigration-with which we are concerned here-has remained solidly within "public rights" and the statutory delegation to agencies of the power to adjudicate immi-

gration issues has been consistently upheld by the courts. *See, e.g., Crowell v. Benson*, 285 U.S. 22, 51, 52 S.Ct. 285, 76 L.Ed. 598 (1932); *Zakonaite v. Wolf*, 226 U.S. 272, 33 S.Ct. 31, 57 L.Ed. 218 (1912); *Turner v. Williams*, 194 U.S. 279, 24 S.Ct. 719, 48 L.Ed. 979 (1904); *Morel v. Immigration & Naturalization Serv.*, 144 F.3d 248, 251–52 (3d Cir.1998); *Austin v. Shalala*, 994 F.2d 1170, 1177–78 (5th Cir.1993).

### 2. Schor Inquiry

■ Since *Northern Pipeline*, the Supreme Court has moved away from a formalistic approach to separation of powers questions. *See Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). The Court has recognized that "our precedents in this area do not admit of easy synthesis.... Rather, the constitutionality of a given congressional delegation of adjudicative functions to a non-Article III body must be assessed by reference to the purpose underlying the requirements of Article III." *Id.* at 846–47, 106 S.Ct. 3245. *Schor* suggests the balancing of four non-determinative factors in determining the constitutionality of congressional delegation of matters to a non-Article III forum:

> Among the factors upon which we have focused are the extent to which the "essential attributes of judicial power" are reserved to Article III courts, and conversely, the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, the origins and importance of the right to be adjudicated, and the concerns that drove Congress to depart from requirements of Article III.

*Id.* at 851, 106 S.Ct. 3245.

Although the Supreme Court has approved of the imposition of civil fines by administrative agencies for violations of U.S. immigration law, *see Austin v. Shalala*, 994 F.2d 1170, 1177–78 (5th Cir.1993) (*citing Lloyd Sabaudo Societa v. Elting*, 287 U.S. 329, 335, 53 S.Ct. 167, 77 L.Ed.

341 (1932)), the determination that the sanction imposed in this case is civil does not end our inquiry. "[P]ractical attention to substance rather than doctrinaire reliance on formal categories should inform application of Article III." *Thomas,* 473 U.S. at 586, 105 S.Ct. 3325. In determining the constitutionality of congressional delegation of adjudicatory power over section 1324c fines to a non-Article III forum, the four factors articulated in *Schor* must be considered.

### Extent to Which the Essential Attributes of Judicial Power Are Reserved to Article III Courts

In order to retain the essential attributes of judicial power, "there must be both the appearance and the reality of control by Article III judges over the interpretation, declaration, and application of federal law." *Pacemaker Diagnostic Clinic,* 725 F.2d at 544. Under section 1324c, hearings conducted pursuant to section 1324c are governed by the Administrative Procedure Act (APA), 5 U.S.C. § 554. *See* 8 U.S.C. § 1324c(d)(2)(B). *See also* 28 C.F.R. § 86 *et seq.* Although aspects of section 1324c are troublesome, Article III courts retain their essential attributes under section 1324c's adjudicatory scheme.

■ Important to this determination is the level of judicial review retained over ALJ decisions. *See Schor,* 478 U.S. at 853, 106 S.Ct. 3245 (noting the importance of de novo appellate review of questions of law).[5] An appropriate level of judicial review ensures that Article III courts retain "the appearance and reality of control ... over the interpretation, declaration, and application of federal law." *Pacemaker Diagnostic Clinic,* 725 F.2d at 544. Section 1324c provides for appellate review in that

"[a] person or entity adversely affected by a final order under this section may ... file a petition in the Court of Appeals for the appropriate circuit for review of the order". 8 U.S.C. § 1324c(d)(5). This section imposes a de novo standard of review on conclusions of law. *See Villegas–Valenzuela v. Immigration & Naturalization Service,* 103 F.3d 805, 808 (9th Cir.1996) ("We review questions of statutory interpretation de novo."). *See also Maka v. Immigration & Naturalization Service,* 904 F.2d 1351, 1355 (9th Cir.1990) ("We review de novo an agency's conclusions of law. . . . 'Within the de novo framework we give a certain amount of deference to an agency's reasonable construction of a statute it is charged with administering.' ") (citation omitted), *amended* 904 F.2d 1351 (9th Cir.1990).

■ Pursuant to the APA, factual findings may only be overturned on appeal if they are "unsupported by substantial evidence." *Mester Mfg. Co. v. Immigration & Naturalization Service,* 879 F.2d 561, 565 (9th Cir.1989).[6] This standard is less deferential than the "clearly erroneous" standard viewed with disfavor in *Northern Pipeline. See Northern Pipeline,* 458 U.S. at 85, 102 S.Ct. 2858. It is similar to the "supported by the evidence" standard imposed in the adjudicatory scheme found constitutional in *Crowell v. Benson,* 285 U.S. 22, 46–48, 52 S.Ct. 285, 76 L.Ed. 598 (1932). *See also Northern Pipeline,* 458 U.S. at 85, 102 S.Ct. 2858.

Pursuant to section 1324c, an ALJ may impose a fine. Although this may seem to be within the purview of an Article III court, this concern is mitigated because ALJs do not have the authority to enforce the fine. Section 1324c explicitly requires

---

**5.** Although informative, this factor is not necessarily determinative. *See Thomas,* 473 U.S. at 583, 105 S.Ct. 3325 ("Many matters that involve the application of legal standards to facts and affect private interests are routinely decided by agency action with limited or no review by Article III courts."). *See also Morel,* 144 F.3d at 251–52 ("[R]elevant Supreme Court authority does not mandate judicial re-

view by an Article III court of questions of law underlying legislatively-created public rights such as immigration.") (citation omitted).

**6.** "[Substantial evidence] means such relevant evidence, as a reasonable mind might accept as adequate to support a conclusion." *Maka,* 904 F.2d at 1355.

that the government seek enforcement of the final order in "any appropriate district court" if a party fails to comply with the ALJ's order. *See* 8 U.S.C. § 1324c(d)(6). *See also* 28 C.F.R. § 68.53. Accordingly, under section 1324c, Article III courts retain the essential attributes of judicial power.

### Limited Jurisdiction Assigned to Administrative Agency

Section 1324c provides ALJs with limited jurisdiction to impose a sanction. They may only impose a civil fine. Although Noriega–Perez argues that section 1324c entrusts non-Article III forums with the "essential attributes" of Article III courts because the penalty imposed by section 1324c is criminal in nature, *Hudson* compels the conclusion that section 1324c imposes a civil, not criminal, sanction.

Furthermore, the grant of jurisdiction to administrative tribunals under section 1324c is limited in scope. The ALJ is given jurisdiction over a "particularized area of law." *Schor,* 478 U.S. at 852, 106 S.Ct. 3245 (citation omitted). Section 1324c applies only to fraud committed "for the purpose of satisfying requirements of [the Immigration and Nationality Act]." 8 U.S.C. § 1324c(a)(2). The bankruptcy scheme invalidated in *Northern Pipeline,* on the other hand, involved a broad grant of jurisdiction extending to "all civil proceedings ... arising in or related to cases under title 11." *Northern Pipeline,* 458 U.S. at 85, 102 S.Ct. 2858 (quoting 28 U.S.C. § 1471(b)). Therefore, the jurisdiction granted to ALJs under section 1324c is limited in scope.

### Nature of the Right to be Adjudicated

Section 1324c involves the public right to regulate immigration. *See Crowell,* 285 U.S. at 51, 52 S.Ct. 285 (1932). As dis-

cussed above, public rights is one of the areas best established as suitable for adjudication by an administrative agency. *See Northern Pipeline,* 458 U.S. at 67–68, 102 S.Ct. 2858. Additionally, because section 1324c imposes a civil sanction, it does not implicate the important rights afforded to criminal defendants under the Constitution.

Controlling the unlawful employment of undocumented aliens has been recognized as an important aspect of U.S. immigration law. *See Immigration & Naturalization Serv. v. National Center for Immigrants' Rights, Inc.,* 502 U.S. 183, 187, 112 S.Ct. 551, 116 L.Ed.2d 546 (1991). In fact, the Supreme Court has long recognized that the power to exclude alien laborers is "necessarily intertwined with the power to punish any who assist in their introduction." *Lees v. United States,* 150 U.S. 476, 478–79, 14 S.Ct. 163, 37 L.Ed. 1150 (1893).[7] Furthermore, as the Fifth Circuit has noted, the Supreme Court "has approved the use of administrative agencies in adjudicating violations of the customs and immigration laws and assessing penalties therefor." *Austin v. Shalala,* 994 F.2d 1170, 1177–78 (5th Cir.1993) (citing *Lloyd Sabaudo Societa Anonima Per Azioni v. Elting,* 287 U.S. 329, 335, 53 S.Ct. 167, 77 L.Ed. 341 (1932)). Accordingly, section 1324c properly implicates the adjudication of the public right to regulate immigration.

### Congressional Concerns Behind Section 1324c

The fourth and final factor, congressional concerns behind passage of section 1324c, demonstrates that Congress acted with a proper purpose. Noriega–Perez relies on statements made by Senator Alan Simpson three years after the enactment of section 1324c. *See* 139 Cong. Rec.

---

7. Federal immigration law has historically addressed immigrant labor concerns by providing for non-criminal sanctions against individuals and regulated companies attempting to evade regulation. *See Grant Brothers Constr. Co. v. United States,* 232 U.S. 647, 658, 34 S.Ct. 452, 58 L.Ed. 776 (1914) (upholding the award of a civil fine against a defendant who "solicited the migration and importation into the United States ... of a designated alien laborer"); *Millon,* 219 F. at 187; *United States v. Banister,* 70 F. 44, 44 (C.C.D.Vt. 1895).

S15958, S15964 (daily ed. Nov. 17, 1993). He maintains that these statements suggest that Congress possessed an improper purpose when it enacted section 1324c because it was concerned with the inefficient prosecution of these cases pursuant to section 1324c's criminal counterpart. We do not agree that the statements establish an improper purpose.

■ Efficiency is a valid concern that may drive "Congress to depart from the requirements of Article III." *Schor*, 478 U.S. at 851, 106 S.Ct. 3245. In *Schor*, the Supreme Court upheld a statute creating a non-Article III forum that was intended "to create an inexpensive and expeditious alternative forum." *Id.* at 855, 106 S.Ct. 3245. Other federal courts have recognized that efficiency and reduced expense are proper purposes for committing matters for adjudication by administrative tribunals. *See United States v. Seals*, 130 F.3d 451, 460 (D.C.Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 2323, 141 L.Ed.2d 697 (1998).[8]

In fact, efficiency is one of the primary reasons Congress grants adjudicatory functions to non-Article III judges. *See* Richard H. Fallon, Jr., *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L.Rev. 915, 935–36 (1988). Few, if any, non-Article III courts would survive judicial scrutiny if efficiency became an impermissible reason for their establishment.

Accordingly, examination of all four *Schor* factors demonstrates that section 1324c does not disturb "the whole constitutional structure" by impermissibly delegating Article III judicial power to a non-Article III court.

### 3. Free of Potential Domination By Other Branches

The four *Schor* factors, however, address only one of the purposes of Article III, to protect "the role of the independent judiciary within the constitutional scheme,"

*Schor*, 478 U.S. at 850, 106 S.Ct. 3245. We must also consider whether the delegation at issue here endangers litigants' "right to have claims decided before judges who are free of potential domination by other branches of government." *Id.* Although the congressional scheme embodied in section 1324c poses little danger to the role of the independent judiciary, the possible domination by the executive branch necessitates an additional inquiry. This issue is a of particular concern where, as here, the parties are compelled to proceed before a non-Article III tribunal.

The Supreme Court has pointed to a party's consent to an initial adjudication before a non-Article III tribunal as a significant factor in determining that Article III permits adjudication. *See Schor*, 478 U.S. at 848–50, 855, 106 S.Ct. 3245 (separation of powers concerns are diminished where the decision to invoke the non-Article III forum is left entirely to the parties and the power of the federal judiciary to take jurisdiction of these matters is unaffected). Nevertheless, we conclude that, because of the due process protections afforded by the scheme at issue here and the historic treatment of immigration issues as matters subject to initial resolution in an administrative forum, Congress' delegation of adjudicatory power over section 1324c disputes does not violate Article III. *See* Paul Verkuil, *Separation of Powers, The Role of Law, and the Idea of Independence*, 30 Wm. & Mary L.Rev. 301, 316–17 (1988).

### Conclusion

Because we reject both of the constitutional challenges to the fine imposed in this case and because section 1324c involves a civil fine constitutionally imposed in a non-Article III forum, we affirm.

FERGUSON, Circuit Judge, Dissenting:

Under today's ruling, the majority holds that Congress has the power to authorize

---

**8.** *Cf. Mistretta v. United States*, 488 U.S. 361, 363–64, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989).

the criminal punishment of an illegal act before an administrative tribunal that has only minimal oversight from Article III courts. It is surprising to me that the Ninth Circuit disregards the constitutional separation of powers for the sake of increasing the administrative bureaucracy in this manner. As I read the Constitution, Article III prohibits such Congressional redistribution of the judicial power.[1]

The majority's decision is wrong for two reasons. First, it incorrectly concludes that the penalty imposed on Noriega–Perez is not a form of criminal punishment for Article III purposes. Second, it completely fails to understand that Article III and the doctrine of separation of powers prohibits Congress from giving an administrative agency the power to adjudicate the criminal punishment present in this case. I will address both of those problems in turn.

### I

A good portion of the majority opinion focuses on analyzing 8 U.S.C. § 1324c under *Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), and concluding that petitioner was not punished criminally. In the context of petitioner's Article III claim that his being fined for immigration document fraud by a non-Article III court violated principles of separation of powers, the majority's analysis is both misguided and incorrect. A proper analysis of petitioner's case would conclude that his being fined for immigration document fraud is a form of criminal punishment for Article III purposes.

### A

A test developed in one area of the law cannot simply be grafted onto another area of the law without risking serious jurisprudential problems. The majority's analysis of *Hudson* does just that by taking a test developed for the protections of personal liberties such as Fifth and Sixth

Amendment guarantees and grafting it onto an Article III analysis designed to protect the structural integrity of our three branches of government. For that reason, the majority's reliance on *Hudson* is completely misplaced in this case.

*Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), is the latest in the Supreme Court's Double Jeopardy Clause jurisprudence. In the case, the Court used a two part test to determine if a second instance of punishment is civil or criminal: first, did the legislature indicate expressly or impliedly that the punishment was criminal; and second, if not, was the statutory scheme so punitive in purpose or effect that it is transformed into a criminal penalty. *Id.* at 493. That second part of the analysis is guided by the seven factors listed in *Kennedy v. Mendoza–Martinez,* 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), as helpful in determining whether an act of Congress is penal or regulatory in character. Under the seven *Mendoza–Martinez* factors, the Court found that the statute at issue in *Hudson* did not constitute criminal punishment giving rise to double jeopardy concerns. *Hudson,* 118 S.Ct. at 495–96.

Although *Hudson* arose in the double jeopardy context, in ruling on the Article III issue in this case the majority introduces its analysis of *Hudson* with the following statement: "[*Hudson* ] must guide our discussion of [Noriega–Perez's] Article III claim because the classification of a sanction imposed by an ALJ as civil in nature is highly probative, although not necessarily determinative, of the constitutionality of the ALJ's jurisdiction." Slip op. at 5979. The majority provides no explanation or citation for why *Hudson,* a double jeopardy case, "must guide" an analysis of Article III issues. Moreover, as shown below, using *Hudson* and *Mendoza–Martinez* in the Article III context is unprecedented and misguided.

---

**1.** I do not dissent from the majority's conclusion that petitioner's fine did not violate the

Double Jeopardy clause.

To see why *Hudson* and *Mendoza–Martinez* are not applicable to the Article III context, a look at *Mendoza–Martinez* is necessary. In *Mendoza–Martinez,* the Supreme Court decided that the federal statutes imposing loss of citizenship as punishment for leaving or remaining outside the country to avoid the draft were criminal statutes requiring the protections of the Fifth and Sixth Amendments. *Mendoza–Martinez,* 372 U.S. at 165–66, 83 S.Ct. 554. The Court reached that conclusion by considering the legislative history of the statutes. *See id.* at 169–84, 83 S.Ct. 554. In *dicta,* the Court listed seven factors used by it in the past to determine if a statute is penal or regulatory:

> Whether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of *scienter,* whether its operation will promote the traditional aims of punishment—retribution and deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned....

*Id.* at 168–69, 83 S.Ct. 554 (internal footnotes omitted). The Court, though, did not apply those factors, instead just stating in a conclusory fashion that "we are convinced that application of these criteria to the face of the statutes [in this case] supports the conclusion that they are punitive...." *Id.* at 169, 83 S.Ct. 554.

Since then, the Court has used the *Mendoza–Martinez* factors sparingly and in only limited contexts. In the cases that do use the *Mendoza–Martinez* factors, the Court has looked to whether Fifth and Sixth Amendment protections apply, *see, e.g., United States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980),

whether the Due Process Clause has been violated, *see, e.g., Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *Schall v. Martin,* 467 U.S. 253, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984), whether a law constitutes a bill of attainder, *see, e.g., Nixon v. Administrator of General Services,* 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977), and whether a law constitutes criminal punishment for the purposes of the Double Jeopardy Clause, *see Hudson v. United States,* 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997). None of those cases involved a look to the constitutional structural guarantees behind our form of government that are relevant to an Article III analysis.

In fact, that the *Mendoza–Martinez* test is applicable only in certain contexts is a truth that has been recognized by courts time and time again. The Supreme Court stated this fact explicitly in *Austin v. United States,* 509 U.S. 602, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993). In that case, the Court refused to apply *Mendoza–Martinez* to an Excessive Fines Clause claim. *See id.* at 610 n. 6, 113 S.Ct. 2801. Likewise, in discussing *Mendoza–Martinez,* the Ninth Circuit has noted the Supreme Court's "warn[ing] against lifting a test for punishment from one constitutional provision and applying it to another." *See Russell v. Gregoire,* 124 F.3d 1079, 1086 n. 6 (9th Cir.1997) (citing *United States v. Ursery,* 518 U.S. 267, 116 S.Ct. 2135, 2146, 135 L.Ed.2d 549 (1996)), *cert denied,* —— U.S. ——, 118 S.Ct. 1191, 140 L.Ed.2d 321 (1998). Finally, in an exhaustive analysis of this topic, the New Jersey Supreme Court concluded that the *Mendoza–Martinez* factors are extremely context-sensitive and not to be applied outside the areas already recognized by the United States Supreme Court. *Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 399–404 (N.J.1995).[2]

---

**2.** *Doe v. Poritz* was decided before the United States Supreme Court's decision in *Hudson v. United States.* One of *Doe*'s conclusions was that the *Mendoza–Martinez* factors did not apply in double jeopardy cases. Obviously,

now that *Hudson* has been decided, *Doe*'s conclusion with respect to double jeopardy was wrong. However, *Hudson* does not detract from the court's analysis that *Mendoza–Martinez* is context-sensitive.

That the *Mendoza–Martinez/Hudson* factors cannot be applied indiscriminately to any constitutional inquiry is apparent not only from the case law that actually says so but also from looking at the factors themselves and the Article III considerations before the Court in this case. Looking to whether a statute imposes punishment in the manner that both *Mendoza–Martinez* and *Hudson* do is useful in determining whether an individual's constitutional rights have been violated. Concerns about criminal prosecutions without due process and the protections of the Fifth and Sixth Amendments or in violation of the Double Jeopardy Clause naturally lend themselves to an analysis of whether the statute at issue is penal or regulatory.

On the other hand, Article III has more global concerns than an individual's constitutional protections. Article III, and the doctrine of separation of powers of which it is a part, safeguards the structure of government through guaranteeing the integrity of the judicial branch. *See Thomas v. Union Carbide Agric. Prods. Co.,* 473 U.S. 568, 582–83, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) ("These requirements protect the role of the independent judiciary within the constitutional scheme of tripartite government and assure impartial adjudication in federal courts."). *Mendoza–Martinez* and *Hudson* do not address such concerns and cannot be used to do so. The majority's use of the seven factors to begin its analysis of an Article III issue is misguided.

### B

Even if I were to agree that the *Mendoza–Martinez/Hudson* factors were the appropriate analytical framework for determining whether the punishment here was criminal or civil in nature, I believe the majority has misapplied those factors in a way that seriously misses the fact that petitioner here was punished criminally.

The majority has misapplied key components of the *Mendoza–Martinez/Hudson* analysis. In looking to whether the sanction has historically been regarded as punishment, the majority states that "monetary penalties for violations of immigration regulation ... have historically been treated as civil in nature." Slip op. at 5980. All of the cases the majority cites for that proposition, however, involve a more specific area of law than the broad category of "violations of immigration regulation"; they all involve monetary penalties for assisting an alien in illegally entering this country. *See Hepner v. United States,* 213 U.S. 103, 104–05, 29 S.Ct. 474, 53 L.Ed. 720 (1909) (statute prohibiting inducing an alien "to migrate to the United States for purpose of performing labor here"); *Millon v. United States,* 219 F. 186, 186 (2d Cir.1914) (same); *United States v. Atlantic Fruit Co.,* 206 F. 440, 442 (2d Cir.1913) (statute regulating steamships bringing aliens into country).

Noriega–Perez's actions did not involve bringing people into this country; he forged official documents. Although his actions fall within the broad category of "immigration," they are materially different than bringing people into this country because they are illegal regardless of United States immigration requirements.

Moreover, unlike in *Hudson* where the fine covered people working within the heavily regulated banking industry, the monetary fine here is being imposed on an individual not engaged in a heavily regulated industry. Imposing fines on an individual for a violation of a statute has certainly historically been viewed as punishment for a wrongdoing. *See Browning–Ferris Indus. v. Kelco Disposal, Inc.,* 492 U.S. 257, 265, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (stating that at the time of the drafting and ratification of the Eighth Amendment, "the word 'fine' was understood to mean a payment to a sovereign as punishment for some offense. Then, as now, fines were assessed in criminal, rather than in private civil, actions."); *see also Department of Revenue v. Kurth Ranch,* 511 U.S. 767, 779, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994) ("[F]ines, penalties, and forfeitures are readily characterized as sanctions.");

*Ingraham v. Wright,* 430 U.S. 651, 664, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977) ("Bail, fines, and punishment traditionally have been associated with the criminal process...."). Referring to the statute at issue here, the Fifth Circuit has stated that the fine under § 1324c is a "punishment of the crime." *Velasquez–Tabir v. INS,* 127 F.3d 456, 460 (5th Cir.1997). Although the Supreme Court found a monetary penalty not to be historically viewed as punishment in the *Hudson* context, it is clear that a monetary penalty of the type here—against an individual for a criminal act not related to a heavily regulated industry—is historically regarded as punishment.

Legislative history also indicates that sanctions for document fraud in violation of this provision of the immigration laws were historically regarded as criminal punishment. In 1993, in a statement referencing the original immigration document fraud legislation enacted in 1990, Senator Alan Simpson stated the following:

> In 1990, I offered an amendment to the Immigration Act of 1990 to create civil penalties for document fraud. This amendment was necessary because U.S. attorneys were reluctant to bring criminal charges against aliens and others who used fraudulent documents to obtain immigration or employment benefits. By establishing new civil penalties for this type of document fraud, immigration officers could file complaints and bring these charges without involving the U.S. attorneys.

139 Cong. Rec. S15958, S15964 (daily ed. Nov. 17, 1993) (statement of Sen. Simpson). He also stated:

> You may be interested to know that a similar provision was included in the 1990 immigration law, which Senator Kennedy and I cosponsored, where we addressed the use of fraudulent documents to obtain immigration benefits. The INS has been very pleased with the process and has successfully brought actions against individuals which otherwise might have been left at the very bottom

of the case pile in the Federal criminal court system.

139 Cong. Rec. S2897, S2903 (daily ed. March 16, 1993) (statement of Sen. Simpson). Those two statements indicate that Congress's intent was to remove these crimes from criminal court and put them under the jurisdiction of the administrative agency so that the sanctions could be applied more swiftly and surely. That intent shows that historically the sanction for immigration document fraud has been seen as criminal punishment, for the crime was historically dealt with in criminal court.

The other major error in the majority's *Mendoza–Martinez /Hudson* analysis is that it fails to look at § 1324c "on its face." *See Hudson,* 118 S.Ct. at 494. According to the majority, the imposition of a $96,000 fine in this case of more than 300 violations of the statute is not excessive. *See* slip op. at 5983. That analysis, though, ignores *Hudson*'s command that, in conducting the *Mendoza–Martinez* analysis, courts are to "attribute no significance to the sanctions actually imposed...." *See United States v. Mayes,* 158 F.3d 1215, 1223 (11th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1130, 143 L.Ed.2d 123 (1999).

Considering the statute on its face affects the analysis for three of the *Mendoza–Martinez* factors: whether the statute promotes the traditional aims of punishment, whether there are alternative noncriminal purposes for the statute, and whether the penalty is excessive. If the majority were to analyze the statute on its face, those three factors would point to a conclusion that the statute is criminally punitive.

Section 1324c provides that the penalty shall be "not less than $250 and not more than $2,000 for each document that is the subject of a violation." 8 U.S.C. § 1324c(d)(3)(A). Nowhere does the statute tie the per-violation fine or the ALJ's discretion to impose a penalty within the stated range to the amount the government or the employer lost due to the viola-

tions. That scheme must be looked at in light of the Supreme Court's stated difference between civil and criminal actions: "the[re is a] line between civil, remedial actions brought primarily to protect the government from financial loss and actions intended to authorize criminal punishment to vindicate public justice." *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 548–49, 63 S.Ct. 379, 87 L.Ed. 443 (1943). Using *Hess* as the basis of analysis, the statute, looked at on its face, falls on the criminal side of the relevant *Hudson* factors because of the lack of correlation between the penalty and any facts regarding the crime: the statute promotes the traditional aims of punishment by deterring, it does so to the exclusion of any alternative non-criminal purposes,[3] and it is excessive. Accordingly, under *Mendoza–Martinez* and *Hudson,* the imposition of fines in accordance with § 1324c would have to be considered a form of criminal punishment.

On a more general level, the majority has misused the *Mendoza–Martinez* and *Hudson* factors. The majority uses the *Mendoza–Martinez/Hudson* factors as if they were completely determinative of the issue at hand. After analyzing each of the seven factors under separate headings, the majority balances them and concludes that "the factors here do not demonstrate by the clearest proof that section 1324c's monetary sanction is so punitive that it is criminal in nature." Slip op. at 5983. In reaching this conclusion, the majority has ignored the multiple warnings from the Supreme Court that the *Mendoza–Martinez* factors are "certainly neither exhaustive nor dispositive." *Ward,* 448 U.S. at 249, 100 S.Ct. 2636; *accord United States v. One Assortment of 89 Firearms,* 465

U.S. 354, 365 n. 7, 104 S.Ct. 1099, 79 L.Ed.2d 361 (1984). Rather, they are "useful guideposts" in determining if something is "punishment in the constitutional sense of that word." *Wolfish,* 441 U.S. at 538, 99 S.Ct. 1861; *Hudson,* 118 S.Ct. at 493. Giving the factors full dispositive weight, as the majority does, flies in the face of the Supreme Court's description of the factors as non-dispositive useful guideposts.

The majority also errs in its analysis of the *Mendoza–Martinez/Hudson* factors by failing to look to other factors outside of the *Mendoza–Martinez/Hudson* list that may also have a bearing on this case. *Mendoza–Martinez*'s list of factors is by no means an "exhaustive" list. *See Ward,* 448 U.S. at 249, 100 S.Ct. 2636. Other considerations should be taken into account, especially considering the differing nature of the inquiry we must make here—the appropriateness of resolution of Noriega–Perez's case before a non-Article III judge—from the inquiry in *Hudson* itself. Factors such as the seriousness of the offense, whether it has traditionally been tried before a jury, and whether it would fall into the mala in se category of crimes are important. Under those additional factors, there is further proof that the statute punishing document fraud is criminal rather than civil.

When looked at in the context framed above, *i.e.,* in the proper historical context, on its face, with the *Mendoza–Martinez/Hudson* factors given their appropriate non-dispositive weight, and with other factors that are relevant added into the mix, the statute under which petitioner was fined can be described only as a form of

---

**3.** The majority contends that there are several non-punitive purposes for § 1324c. Three of the four suggested purposes, *see* slip op. at 1174, are just alternative formulations of the deterrence rationale. The other stated purpose, to "reimburs[e] the government for enforcement expenditures," *id.* at 1174, is clearly not a purpose of the statute when looked at on its face. A simple hypothetical demonstrates this fact: If the government spent $100,000 in enforcing § 1324c and the inves-

tigation discovered only one document, the most the government could recover would be $2,000. However, if the government spent the same $100,000 but happened upon a stash of 10,000 forged documents, the government could recover a minimum of $2,500,000 and a maximum of $20,000,000. I am at a loss as to how the majority can reconcile such absurd possibilities under the statutory scheme with a purpose of "reimbursing the government for enforcement expenditures."

criminal punishment. The majority's conclusion to the contrary clouds its analysis of the central issue in this case: whether the ALJ's imposition of the fine violated Article III's guarantees.

## II

Article III requires that federal judges serving with life tenure during good behavior and with protection against diminished compensation exercise "[t]he judicial Power of the United States." The provisions of Article III "guarantee that the process of adjudication itself remain[ ] impartial." *Northern Pipeline Constr. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 58, 102 S.Ct. 2858, 73 L.Ed.2d 598 (1982) (Brennan, J., plurality). Without Article III protections, "the judge might behave with all the violence of *an oppressor.*" The Federalist No. 47, at 246 (James Madison) (Bantam Classic ed., 1982). Under the majority's opinion, this Court takes a significant step toward unleashing the "violence of an oppressor" by authorizing the imposition of a criminal fine by a non-independent administrative body.

Article III and the doctrine of separation of powers protects "the whole constitutional structure by requiring that each branch retain its essential powers and independence." *Pacemaker Diagnostic Clinic of America, Inc. v. Instromedix, Inc.*, 725 F.2d 537, 544 (9th Cir.1984) (en banc). In its recent decisions focusing on separation of powers in the Article III context, the Supreme Court has "declined to adopt formalistic and unbending rules" to determine when the doctrine is breached by a "non-Article III tribunal impermissibly threaten[ing] the institutional integrity of the Judicial Branch." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). Instead, it has adopted a flexible balancing test:

> [I]n reviewing Article III challenges, we have weighed a number of factors, none of which has been deemed determinative, with an eye to the practical effect that the congressional action will have on the constitutionally assigned role of

the federal judiciary. Among the factors upon which we have focused are [1] the extent to which the essential attributes of judicial power are reserved to Article III courts, and, conversely, [2] the extent to which the non-Article III forum exercises the range of jurisdiction and powers normally vested only in Article III courts, [3] the origins and importance of the right to be adjudicated, and [4] the concerns that drove Congress to depart from the requirements of Article III.

*Id.* (internal citation and quotations omitted); *accord Simpson v. Office of Thrift Supervision*, 29 F.3d 1418, 1422 (9th Cir. 1994). The majority incorrectly applies the *Schor* test and concludes that the ALJ's fine here did not violate the Constitution. A proper application. of the *Schor* test necessitates a conclusion that 8 U.S.C. § 1324c compromises Article III guarantees and is unconstitutional.

Under *Schor*, the first two factors require a look at how the congressional enactment affects the balance of judicial power between the Article III and non-Article III courts. Under § 1324c(d)(5), Article III courts retain some of their essential attributes because a person fined has recourse in Article III courts via an appeal to a Court of Appeals. *See Simpson*, 29 F.3d at 1423. However, the Article III court does not have the power of de novo review, something the *Schor* Court found vitally important in upholding the adjudicatory powers of the Commodity Futures Trading Commission. *Schor*, 478 U.S. at 853, 106 S.Ct. 3245. Nor does § 1324c require an Article III court order to enforce the fine, something the *Schor* Court also found important. *See id.* Also, unlike in *Schor*, the hearing before the ALJ was not an option that Noriega–Perez could have opted out of in favor of Article III adjudication. *See id.* at 848–50, 106 S.Ct. 3245. And, finally, *Schor* emphasized that the scheme at issue there did not offend Article III because it merely involved counterclaim jurisdiction that was

necessary to make the "procedure workable," *id.* at 856, 106 S.Ct. 3245; that is not at all the case here. All of these factors contribute to Article III courts being deprived of the essential attributes of the judicial power in the context of immigration document fraud fines. Merely reciting the usual standards of judicial review from the APA, *see* slip op. at 5987–88, does nothing to change this fact.

Under the second prong of *Schor*, § 1324c gives non-Article III courts the original decision making function with respect to fining an individual for private conduct not related to a regulated industry. Enforcement of § 1324c goes as follows: the INS, a part of the executive branch under 8 U.S.C. § 1551 (placing the INS under the Department of Justice), brings charges of document fraud against an individual for resolution before another part of the executive branch, the EOIR, *see* 8 U.S.C. § 1101(b)(4) (placing the EOIR under the Attorney General); *see also* 8 C.F.R. § 3.0. Resolution of such a matter is something traditionally "vested only in Article III courts." *See Schor*, 478 U.S. at 851, 106 S.Ct. 3245. As noted in the discussion of the *Hudson* factors, fining an individual is a form of criminal punishment. *See Browning–Ferris*, 492 U.S. at 265, 109 S.Ct. 2909; *Ingraham*, 430 U.S. at 664, 97 S.Ct. 1401. Criminal punishment is something exclusively reserved for Article III courts. *See Northern Pipeline*, 458 U.S. at 70 n. 24, 102 S.Ct. 2858 (Brennan, J., plurality) (Non–Article III adjudication is not permitted for "any criminal matters, although the Government is a proper party."); *see also In re Hipp, Inc.*, 895 F.2d 1503, 1511 (5th Cir. 1990) (noting that, within the public rights exception, non-Article III adjudication "has never encompassed criminal matters") (citing R. Fallon, *Of Legislative Courts, Administrative Agencies, and Article III*, 101 Harv. L.Rev. 915, 952 & n. 208 (1988)). Although various courts have approved the delegation of parts of the criminal process to non-Article III magistrates, *see Peretz v. United States*, 501 U.S. 923, 936, 111 S.Ct. 2661, 115 L.Ed.2d 808 (1991) (consented-to voir dire); *United States v. Raddatz*, 447 U.S. 667, 683–84, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) (suppression hearings); *United States v. Seals*, 130 F.3d 451, 459 (D.C.Cir.1997) (grand jury proceedings), *cert. denied*, —— U.S. ——, 118 S.Ct. 2323, 141 L.Ed.2d 697 (1998), delegating the entire punishment function to the executive raises concerns about the aggrandizement of power in one branch and has never been sanctioned under Article III. The majority's efforts to do so are unprecedented. Under a proper analysis, balancing the first two factors of the *Schor* test shows that although Article III courts retain some of their essential attributes, the non-Article III court exercises a substantial and important portion of Article III jurisdiction and power.

The other two *Schor* factors look to the particular right at issue and Congress' intentions in transferring the adjudication of that right to a non-Article III court. Here, in a very general sense, § 1324c does involve immigration matters, and immigration has indeed historically been within the body of "public rights" capable of being adjudicated outside Article III courts. *See Crowell v. Benson*, 285 U.S. 22, 51, 52 S.Ct. 285, 76 L.Ed. 598 (1932) ("Familiar illustrations of administrative agencies created for the determination of [public rights] are found in connection with the exercise of the congressional power as to ... immigration...."). Yet, declaring this an immigration matter within the category of immigration matters traditionally delegable to a non-Article III tribunal is deceptive and wrong. Immigration is within the penumbra of legislatively-created public rights because the right to enter this country is one created by Congress. In that respect, immigration is the *quintessential* "legislatively-created public right" because it fits within the plain meaning of the term. Not surprisingly, all of the cases cited by the majority, and all of the cases I could find, focusing on the delegation of immigration matters to administrative courts involve violations stemming out of bringing people into this coun-

try in violation of the legislatively-created public right to enter.[4]

This case, however, is wholly different. This case involves the imposition of a fine on someone who is not trying illegally to access or assist in the accessing of a public right. Here, we have the simple act of document fraud—an act that is illegal regardless of any legislatively-created rights. In this case, the offense just happens to involve immigration documents. If this matter is seen as within the realm of immigration and public rights, then so would assaulting an INS official. Under today's ruling, because the assault would be related to the public right of immigration, a person could be tried for that assault before an ALJ and fined accordingly.

Taking the majority's ruling outside the immigration context shows similarly alarming results. The federal government heavily regulates the banking industry. Thus, by the majority's rationale, Congress could place the punishment of passing forged checks before an ALJ without raising any Article III concerns as long as the punishment is a fine rather than imprisonment. Similarly outrageous scenarios can be imagined in each and every area of the law that Congress regulates because the majority's holding boils down to this simple one-sentence syllogism: if related to any area of regulation, the crime is really just a public right that can be delegated to an ALJ.

Some line has to be drawn, and the majority has not articulated a principle by which to do so. Looking to history provides an adequate answer in this case as non-Article III adjudication of this offense is a recent development. Until 1990 with the enactment of 8 U.S.C. § 1324c, punishment for immigration document fraud had

historically been a criminal matter handled by an Article III court. *See* 18 U.S.C. § 1546. Congress's purpose for removing immigration document fraud matters from Article III adjudication was to remove them from the federal criminal courts that were backlogged with drug and violent crime matters. 139 Cong. Rec. S2897, S2903 (daily ed. Mar. 16, 1993) (statement of Sen. Simpson). In doing so, Congress ensured that the INS would exact fines from individuals who would otherwise have their cases "left at the very bottom of the case pile in the Federal criminal court system." *Id.* Congress shifted what had previously been seen as the responsibility of an Article III court to a non-Article III court for the purpose of quickening the process and avoiding the delays inherent in Article III adjudication. In a regulatory context, that might be acceptable; however, when dealing with individual conduct that is not associated with a well-regulated industry, such a purpose is suspect and a threat to the principle of separation of powers.

The majority claims that efficiency is a valid purpose for the transfer of public rights to administrative tribunals. *See* slip op. at 1178. Certainly, that is true with respect to purely regulatory matters. However, in the context of the criminal law and the imposition of criminal fines on private individuals, efficiency cannot justify compromising constitutional protections. If Congress merely had to state that for efficiency purposes it was changing a penalty from criminal to civil and placing the matter before an administrative court, it would have a simple way of evading the constitutional protections given to criminal defendants, such as the right to counsel and a jury trial, because of the simple fact

---

4. The majority cites *Lees v. United States,* 150 U.S. 476, 14 S.Ct. 163, 37 L.Ed. 1150 (1893), as evidence that the power to exclude alien laborers is a public right because it is associated with "the power to punish any who assist in their introduction." *See* slip op. at 1177–78 (citing *Lees,* 150 U.S. at 478–79, 14 S.Ct. 163). The majority reasons that because of that relationship recognized by the Supreme Court, Congress can give an ALJ jurisdiction over immigration document fraud. However, *Lees* had nothing to do with the power to place a matter before an ALJ but rather with whether Congress had the power to regulate the issue at all. No one here disputes Congress has the power to regulate immigration document fraud.

that, as noted above, many crimes are related to an area within the regulatory power of Congress. In this context, efficiency is not a legitimate congressional concern for transferring the adjudication of this matter to an administrative body.

The majority's final consideration under its Article III analysis shows how little it values the principles behind an independent judiciary. Somehow the majority concludes that the compelled adjudication of this matter before an ALJ does not pose the threat of giving adjudicatory authority to judges who are "potential[ly] dominat[ed] by other branches of the government." *See* slip op. at 5992. The majority does not explain how an ALJ who is a part of the executive branch is not dominated by that very branch. Furthermore, there is no escaping the fact that the ALJ who is deciding the case necessarily has a conflict of interest because any fine levied by the ALJ will go to the branch of government controlling the ALJ. The scheme here is exactly the type of "domination" feared by the *Schor* Court.

The Constitution creates a delicate balance of power between the three branches of government that must be vigilantly safeguarded. When one branch of government removes powers from another branch and places those powers in the control of the third branch, it is for the judiciary to place a stop to the mischief. As applied here, the four *Schor* factors indicate that "the practical effect that the congressional action will have on the constitutionally assigned role of the federal judiciary," *Schor,* 478 U.S. at 851, 106 S.Ct. 3245, is to weaken Article III courts by intruding on their traditional power to adjudicate immigration document fraud cases. This Court should hold § 1324c unconstitutional under the separation of powers doctrine.

Because I believe that § 1324c is unconstitutional, Noriega–Perez's fine under that provision should be vacated, and the INS's complaint against him dismissed. I

respectfully dissent from the majority's conclusion to the contrary.